THOMSON–CSF, S.A., Plaintiff–Appellant,

v.

AMERICAN ARBITRATION ASSOCIATION, Defendant,

Evans & Sutherland Computer Corporation, Defendant–Appellee.

No. 1565, Docket 94–9118.

United States Court of Appeals, Second Circuit.

Argued April 18, 1995.

Decided Aug. 24, 1995.

Fredrick E. Sherman, Jones, Day, Reavis & Pogue, New York City (Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, David J. Hensler, A. Lee Bentley, Hogan & Hartson, Washington, DC, on the brief), for plaintiff-appellant.

Dana H. Freyer, Skadden, Arps, Slate, Meagher & Flom, New York City (Daniel J. Fish, Skadden, Arps, Slate, Meagher &

Flom, New York City, on the brief), for defendant-appellee.

Before: MESKILL, ALTIMARI, and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Plaintiff-appellant Thomson–CSF, S.A. ("Thomson") appeals from a judgment entered in the United States District Court for the Southern District of New York (Keenan, J.), denying its request for declaratory and injunctive relief and granting defendant-appellee Evans & Sutherland Computer Corporation's ("E & S") cross-motion to compel arbitration. Thomson asserts that the district court improvidently compelled it to arbitrate against E & S based upon an arbitration agreement between E & S and Thomson's subsidiary, to which Thomson was not a signatory. Because, under ordinary principles of contract and agency law, Thomson cannot be said to have voluntarily submitted to arbitrate its disputes with E & S, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

## BACKGROUND

Rediffusion Simulation Limited ("Rediffusion") was a British company engaged in the business of building flight simulators for the training of pilots. In 1986, Rediffusion entered into a "Working Agreement" with E & S, located in Salt Lake City, Utah. Under the Working Agreement, Rediffusion agreed to purchase computer-generated image equipment (the computer "brain" of the flight simulator) exclusively from E & S and to use its best efforts to market those systems containing E & S equipment; in return, E & S agreed to supply its imaging equipment only to Rediffusion.

Subsequent to entering into the Working Agreement, Rediffusion was sold to Hughes Aircraft Company. Hughes amended and extended the Working Agreement between Rediffusion and E & S. On December 31, 1993, Hughes sold Rediffusion to Thomson, which renamed it Thomson Training and Simulation Limited. Prior to purchasing Rediffusion, Thompson maintained a division

engaged in the business of building flight simulation equipment (the Training and Simulation Systems Division) into which it began integrating Rediffusion.

At the time Thomson began publicly contemplating the acquisition of Rediffusion, E & S informed Thomson that, if it purchased Rediffusion, E & S intended to bind Thomson and its flight simulation division to the Working Agreement. Specifically, E & S told Thomson that upon purchasing Rediffusion both Rediffusion and Thomson's Training and Simulation Systems Division would be required to purchase all needed computer-generated image equipment from E & S. In response, Thomson wrote to E & S seeking to have it waive those provisions of the Working Agreement that E & S believed to be binding upon Thomson. Thomson did not, however, concede that it would be bound by Rediffusion's Working Agreement. In fact, when it became clear that Thomson and E & S could reach no agreement prior to Thomson's acquisition of Rediffusion, Thomson explicitly informed E & S that it was not adopting the Working Agreement and did not consider itself bound by Rediffusion's Agreement which it had neither negotiated nor signed.

*The Working Agreement*

Section 6.1 of the Working Agreement provides for the arbitration of all disputes between the "parties" to the Agreement. While the Agreement provides no explicit definition of "parties," it does define "E & S" and "Rediffusion":

> 1.14 the term "E & S," wherever used in this Working Agreement, shall include the affiliates of E & S.
>
> The term "Rediffusion" wherever used in this Working Agreement, shall ... mean Rediffusion and each of its affiliates.
>
> \*    \*    \*    \*    \*    \*
>
> 1.6 An "affiliate" of a party hereto shall mean any person, firm or corporation that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such party.

Despite the lack of definition for "parties" in the Working Agreement, the district court

found that the term "parties" was intended to mean "E & S and Rediffusion" and, therefore, was also intended to include the affiliates of the parties. Accordingly, the arbitration clause in the Working Agreement purported to bind not only Rediffusion, but also its affiliates—namely, Thomson (given that Thomson indisputably controlled Rediffusion).

*Injunctive Relief*

While under Thomson's ownership, Rediffusion's share of the flight simulator market drastically decreased. On August 8, 1994, E & S filed a demand for arbitration under the Working Agreement against both Rediffusion and its parent-company Thomson, asserting a breach of their obligations arising out of the Working Agreement. Despite Thomson's insistence that it was not bound by the Working Agreement (and the arbitration clause contained therein), E & S filed a demand for arbitration against both Rediffusion and Thomson on August 8, 1994. While Rediffusion did not contest the applicability of the arbitration clause to it, Thomson refused to answer E & S's demand for arbitration. On August 29, 1994, Thomson commenced this action in the Southern District of New York, seeking 1) a declaration that it was not bound by the arbitration clause of the Working Agreement and 2) an injunction prohibiting further proceedings against it under the Working Agreement. E & S cross-moved to compel Thomson to arbitrate.

The district court granted E & S's cross-motion to compel arbitration. In doing so, the district court stated that while E & S's claims did not fall under any of the traditional categories for binding a nonsignatory to an arbitration clause, Thomson was bound nonetheless. Adopting a hybrid approach to binding a nonsignatory to an arbitration agreement, the district court accepted E & S's assertion that "the Court may bind Thomson based on its conduct in voluntarily becoming ... an affiliate, on the degree of control Thomson exercises over [Rediffusion], and on the interrelatedness of the issues." (internal citations and quotations omitted).

Thomson now appeals the judgment of the district court.

## DISCUSSION

■ Arbitration is contractual by nature—"a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Thus, while there is a strong and "liberal federal policy favoring arbitration agreements," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quotations omitted), such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract. "It does not follow, however, that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir.1993). This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the "ordinary principles of contract and agency." *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980); *see also A/S Custodia v. Lessin Int'l, Inc.,* 503 F.2d 318, 320 (2d Cir.1974).

### I. Traditional Bases For Binding Nonsignatories

This Court has recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others. Those theories arise out of common law principles of contract and agency law. Accordingly, we have recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. The district court properly rejected each of these traditional theories as sufficient justification for binding Thomson to the arbitration agreement of its subsidiary.

### A. Incorporation by Reference

■ A nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause. *See Import Export Steel Corp. v. Mississippi Valley Barge Line Co.,* 351 F.2d 503, 505–506 (2d Cir.1965) (separate agreement with nonsignatory expressly "assum[ing] all the obligations and privileges of [signatory party] under the ... subcharter" constitutes grounds for enforcement of arbitration clause by nonsignatory); *Matter of Arbitration Between Keystone Shipping Co. and Texport Oil Co.,* 782 F.Supp. 28, 31 (S.D.N.Y.1992); *Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.,* 658 F.Supp. 809, 813 (S.D.N.Y.1987) (if a "party's arbitration clause is expressly incorporated into a bill of lading, nonsignatories ... who are linked to that bill through general principles of contract law or agency law may be bound"). As the district court noted, E & S has not attempted to show that the Working Agreement was incorporated into any document which Thomson adopted. Thus, Thomson cannot be bound under an incorporation theory.

### B. Assumption

■ In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate. *See Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1105 (2d Cir.) (flight attendants manifested a clear intention to arbitrate by sending a representative to act on their behalf in arbitration process), *cert. denied,* 502 U.S. 910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991); *Keystone Shipping,* 782 F.Supp. at 31; *In re Transrol Navegacao S.A.,* 782 F.Supp. 848, 851 (S.D.N.Y.1991). While Thomson was aware that the Working Agreement purported to bind it as an "affiliate" of Rediffusion, at no time did Thomson manifest an intention to be bound by that Agreement. In fact, Thomson explicitly disavowed any obligations arising out of the Working Agreement and filed this action seeking a declaration of non-liability under the Agreement. Accordingly, it cannot be said that Thomson assumed the obligation to arbitrate.

### C. Agency

■ Traditional principles of agency law may bind a nonsignatory to an arbitration agreement. *See Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4, 6–7 (2d Cir.1981); *A/S Custodia,* 503 F.2d at 320; *Fisser,* 282 F.2d at 233–38; *Keystone Shipping,* 782 F.Supp. at 31–32. Because the Working Agreement was entered into well before Thomson purchased Rediffusion, Thomson could not possibly be bound under an agency theory.

### D. Veil Piercing/Alter Ego

■ In some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other. As a general matter, however, a corporate relationship alone is not sufficient to bind a nonsignatory to an arbitration agreement. *See Keystone Shipping,* 782 F.Supp. at 30–31. Nonetheless, the courts will pierce the corporate veil "in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.,* 2 F.3d 24, 26 (2d Cir.1993); *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 138–39 (2d Cir.1991) ("Liability ... may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties."). While the district court below noted that, "[c]ounsel for E & S also denied at oral-argument that its claim was properly articulated as veil-piercing," E & S now asserts that an alter ego relationship between Thomson and Rediffusion may exist. While E & S concedes that it can make no showing of fraud, it argues that Thomson sufficiently dominated Rediffusion as to justify veil piercing.

■ Veil piercing determinations are fact specific and "differ[ ] with the circumstances of each case." *American Protein Corp. v.*

*AB Volvo,* 844 F.2d 56, 60 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). This Court has determined that a parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness. *See Carte Blanche,* 2 F.3d at 29 ("No bank accounts, offices, stationery, transactions, or any other activities were maintained or carried on in the name of [the subsidiary].") ; *Wm. Passalacqua,* 933 F.2d at 139 (corporate veil is pierced where, among other things, parent and subsidiary 1) share common office and staff; 2) are run by common officers; 3) intermingle funds; 4) do not deal at arms length with each other; and 5) are not treated as separate profit centers); *see also Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984) (absence of corporate formalities relevant factor in piercing corporate veil). "[T]he factors that determine the question of control and domination are less subjective than 'good faith'; they relate to how the corporation was actually operated." *Carte Blanche,* 2 F.3d at 28–29.

E & S has not demonstrated that Thomson exerted the degree of control over Rediffusion necessary to justify piercing the corporate veil. While the district court found that "Thomson has common ownership with [Rediffusion]; that Thomson actually controls [Rediffusion]; ... [and] that Thomson incorporated [Rediffusion] into its own organizational and decision-making structure," the district court did not find an abandonment of the corporate structure. E & S has not shown an absence of corporate formalities, nor has it shown an intermingling of corporate finances and directorship. Rather, as the district court found, Rediffusion continued to function as a distinct entity closely incorporated into the existing corporate structure of its parent company, Thomson. Accordingly, in light of the totality of the circumstances, Thomson cannot be bound by Rediffusion's arbitration agreement under a veil piercing/alter ego theory.

### E. *Estoppel*

This Court has also bound nonsignatories to arbitration agreements under an estoppel theory. In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir.1993), a foreign accounting firm received a settlement agreement concerning the use of the trade name "Deloitte" in association with accounting practices. Under the agreement—containing an arbitration clause—local affiliates of the international accounting association Deloitte Haskins & Sells International were entitled to use the trade name "Deloitte" in exchange for compliance with the dictates of the agreement. A Norwegian accounting firm received the agreement, made no objection to the terms of the agreement, and proceeded to utilize the trade name. This Court held that by knowingly exploiting the agreement, the accounting firm was estopped from avoiding arbitration despite having never signed the agreement. *See* 9 F.3d at 1064 ("Noraudit failed to object to the Agreement when it received it.... In addition, Noraudit knowingly accepted the benefits of the Agreement.... Thus, Noraudit is estopped from denying its obligation to arbitrate under the 1990 Agreement.").

Although the district court did not analyze the case at hand under an estoppel theory, the court specifically found that:

> Thomson had notice of the Working Agreement prior to ... completing the purchase of Rediffusion, that E & S expressed the intention to bind Thomson to the Agreement prior to the completion of the purchase of Rediffusion, that Thomson incorporated [Rediffusion] into its own organizational and decision-making structure, and that Thomson benefitted from that incorporation.

(citations omitted). On their face, these factual findings appear sufficient to bind Thomson to the arbitration clause of its subsidiary under *Deloitte.* Upon closer inspection, however, the district court's determination that Thomson derived direct benefit from the Working Agreement is erroneous.

As Thomson points out, the Working Agreement provided that Rediffusion would purchase computer-generated image equipment exclusively from E & S and, in return, E & S would supply its imaging equipment only to Rediffusion. E & S concedes that

Thomson has never acquired, nor sought to acquire, imaging equipment from E & S. Rather, E & S asserts a theory of benefit under the Working Agreement which in essence amounts to an anti-trust violation—according to E & S, Thomson purchased Rediffusion (its only serious competitor in the flight simulation industry) so that it could keep Rediffusion from competing; by incorporating Rediffusion into its own structure, Thomson was able to eliminate all simulators utilizing E & S imaging equipment from the market; because E & S was contractually bound to supply only Rediffusion with imaging equipment, it was effectively shut out of the market; thus, E & S contends that Thomson benefitted from the Working Agreement by eliminating E & S as a competitor.

This indirect benefit which E & S asserts—and the district court implicitly adopts—is not the sort of benefit which this Court envisioned as the basis for estopping a nonsignatory from avoiding arbitration. Had Thomson *directly* benefitted from the Working Agreement by seeking to purchase equipment from E & S or enforcing the exclusivity provisions of the Agreement, it would be estopped from avoiding arbitration. The benefit which E & S asserts, however, derives directly from Thomson's purchase of Rediffusion, and not from the Working Agreement itself; Thomson received no benefit at all from the Working Agreement (as opposed to the acquisition). Thus, Thomson is not bound by its subsidiary's arbitration agreement under *Deloitte.*

Several courts of appeal have recognized an alternative estoppel theory requiring arbitration between a signatory and nonsignatory. *See Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir. 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342, 344 (7th Cir.1984). In these cases, a signatory was bound to arbitrate with a nonsignatory at the nonsignatory's insistence because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were 'intimately founded in and intertwined with the underlying contract obligations.'" *Sunkist,* 10 F.3d at 757 (quoting *McBro Planning,* 741 F.2d at 344). It is clear that an arbitration clause bound Thomson's subsidiary, Rediffusion. The district court also found that the management of Rediffusion and Thomson were closely related. Moreover, E & S argues that the claims against Thomson are "intimately founded in and intertwined with" the Working Agreement. Nonetheless, Thomson can not be bound to arbitrate under this line of cases.

As these cases indicate, the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, "[t]he situation here is inverse: E & S, as signatory, seeks to compel Thomson, a non-signatory." While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. *See United Steelworkers,* 363 U.S. at 582, 80 S.Ct. at 1352–53. In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S. Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed.

Moreover, these estoppel cases all involve claims which are integrally related to the contract containing the arbitration clause. The same cannot be said of the case at hand. As discussed above, E & S's claims against

Thomson amount to the assertion that Thomson purchased Rediffusion in order to eliminate it as a competitor. While a cause of action may lie against Thomson for such alleged predatory business practices, the violation can hardly be characterized as arising out of or being integrally related to the Working Agreement between E & S and Rediffusion. Thus, the analogy to this line of estoppel cases again must fail.

II. *The District Court's Hybrid Approach*

■ Despite properly determining that E & S's claims did not fall within any of the traditional theories for binding a nonsignatory, the district court stated, "[n]evertheless, E & S asserts that the Court may bind Thomson based on its conduct in 'voluntarily bec[oming] . . . an affiliate,' on the degree of control Thomson exercises over [Rediffusion], and on the interrelatedness of the issues. This Court agrees." (citations omitted). In so doing, the district court improperly extended the law of this Circuit and diluted the protections afforded nonsignatories by the "ordinary principles of contract and agency." *McAllister*, 621 F.2d at 524. A nonsignatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law.

The district court's opinion relies principally upon two decisions of this Court, *McAllister* and *Deloitte*. According to the district court, these cases in combination provide sufficient support to bind Thomson to the arbitration clause despite Thomson having never signed the Agreement. The district court found that many of the elements present in *McAllister* and *Deloitte* were also present in the case at hand: 1) Thomson's common ownership of Rediffusion; 2) Thomson's actual control of Rediffusion; 3) Thomson's notice of the Working Agreement prior to purchasing Rediffusion; 4) E & S's express intention to bind Thomson to the Working Agreement; 5) Thomson's incorporation of Rediffusion into its own organizational and decision-making structure; and 6) Thomson's benefit from that incorporation. Based upon the totality of these factors, the district court held that *McAllister* and *Deloitte* bound Thomson to Rediffusion's arbitration clause.

The district court's reliance upon *McAllister* and *Deloitte* is misplaced. Both *McAllister* and *Deloitte* fall squarely within traditional theories for binding nonsignatories to an arbitration agreement. In *McAllister*, this Court remanded the case to the district court for an evidentiary hearing in light of indications (on a "scant record") of a close affiliation between the signatory and nonsignatory. This Court, however, specifically instructed the district court to apply "ordinary principles of contract and agency," and clearly pointed to the traditional theories of agency and piercing the corporate veil when directing the district court to reconsider its determination. 621 F.2d at 524. The district court's reliance on *Deloitte* is equally misplaced. As in *McAllister*, this Court in *Deloitte* stated that the district court should apply "[o]rdinary principles of contract and agency." *Id.* at 1064. This Court again pointed to traditional theories for binding nonsignatories, specifically estoppel and agency. *Id.* ("[W]e believe that appellants have . . . strong[ ] arguments, particularly those based upon estoppel."). Neither *McAllister* or *Deloitte* indicate that a nonsignatory can be bound to an arbitration agreement with a less than full showing of some articulable theory under contract or agency law.

The district court below improperly extended the limited theories upon which this Court is willing to enforce an arbitration agreement against a nonsignatory. The district court's hybrid approach dilutes the safeguards afforded to a nonsignatory by the "ordinary principles of contract and agency" and fails to adequately protect parent companies, the subsidiaries of which have entered into arbitration agreements. Anything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations. This Court did not intend such an outcome in *Deloitte* or *McAllister* and does not adopt such an approach here.

## CONCLUSION

Accordingly, the judgment of the district court is reversed and remanded for proceedings consistent with the foregoing.