**SMITH/ENRON COGENERATION LIMITED PARTNERSHIP, INC., Enron International C.V., Enron Development Corp., Enron Reserve I B.V., Atlantic Commercial Financial B.V., and Travamark Two B.V., Petitioners–Appellees,**

v.

**SMITH COGENERATION INTERNATIONAL, INC., Respondent–Appellant.**

**Docket No. 99–7101.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 15, 1999.

Decided: Dec. 8, 1999.

Richard N. Chassin, New York, N.Y. (Becker, Glynn, Melamed & Muffly LLP, Joseph D. Becker, Zeb Landsman, of Counsel), for Respondent–Appellant.

Gregory A. Markel, New York, N.Y. (Brobeck Phleger & Harrison LLP, Ronit Setton, of Counsel), for Petitioners–Appellees.

Before: FEINBERG, VAN GRAAFEILAND and SACK, Circuit Judges.

FEINBERG, Circuit Judge:

Respondent Smith Cogeneration International, Inc. (SCI) appeals from an order of the United States District Court for the Southern District of New York, Richard C. Casey, J., compelling arbitration of claims asserted by SCI in a lawsuit in the Dominican Republic (the Dominican Lawsuit) against petitioners-appellees Smith/Enron Cogeneration Limited Partnership, Inc. (SECLP) and Enron International C.V. (Enron Int'l) and a number of its affiliates (collectively referred to as Enron). SCI's principal arguments on appeal are (1) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention) the district court did not have jurisdiction over this action; (2) the contracts between the parties containing the arbitration clause are no longer enforceable by Enron; and, (3) SCI's claims in the Dominican Lawsuit are not covered by the arbitration clause. For the reasons stated below, we affirm the order of the district court.

## I. Background

This case arises out of a number of agreements between SCI and Enron regarding an electrical power plant in the Dominican Republic. In July 1993, SCI signed a Power Purchase Agreement with a state-owned utility, Compañia Dominicana de Electricidad (CDE), to construct, finance and manage the power plant (Power Purchase Agreement). While negotiating this agreement, SCI encountered strong competition from Enron, which was making its own offers to the Dominican government. After some negotiation, SCI and Enron Int'l agreed to create a joint venture in the construction and operation of the plant as reflected in the Project Agreement they both signed on November 12, 1993 (Project Agreement).

On November 24, 1993, Smith Cogeneration Dominicana (SCD), SCI's affiliate,[1] entered into a limited partnership agreement with Travamark Two B.V. (Travamark), an Enron affiliate (1993 Agreement). The 1993 Agreement created SECLP, a limited partnership organized under the laws of the Turks and Caicos Islands. Pursuant to the 1993 Agreement SCI was to assign its interest in the Power Purchase Agreement to SECLP, which would then take over the construction and operation of the power plant.

Thereafter, a series of assignments by both signatories to the 1993 Agreement (SCD and Travamark) took place. SCD assigned part of its interest in SECLP to SCI. Similarly, Travamark assigned its interest in SECLP to two Enron affiliates, Atlantic Commercial Finance B.V. (ACF) and Enron Reserve I B.V. (ER). The 1993 Agreement was amended in December 1994 to reflect these changes (1994 Agreement).

The 1994 Agreement, like the 1993 Agreement and the Project Agreement that preceded it, contained a broad arbitration clause providing for the arbitration of "any dispute ... arising under or relating to any obligation or claimed obligation under the provisions of this Agreement." All three agreements also provided that the arbitration take place in New York and be governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., and Texas law. The 1993 and the 1994 Agreements were identical in all other relevant respects.

Less than a year after SCI, SCD, ACF, and ER entered into the 1994 Agreement, a second series of assignments took place. In July 1995, ER assigned its general partnership interest to Enron Dominican Republic Operations (EDRO), and ACF assigned its limited partnership interest to Enron Dominican Republic (EDR). Neither party disputes that these assignments were permitted under the 1994 Agreement

1. The principal of both SCD and SCI is the same person, Donald Smith.

and were made with SCI's knowledge and consent. Enron additionally claims that, as with the previous assignments, these assignees are Enron affiliates with identical economic interests and under common control. In contrast to all the previously named Enron affiliates (Enron Int'l, Travamark, ACF, and ER), EDR and EDRO—the current Enron partners in SECLP—were not sued by SCI in the Dominican Lawsuit and are not petitioners in this litigation.

The Enron–SCI relationship began to unravel in 1996 when it became clear that SCI was unable to meet its financial obligations to SECLP. As a result, in April 1996 the 1994 Agreement was amended to include the Smith Dominicana Holding Limited Partnership (Holding Partnership). The Holding Partnership, a creation of SCD and another Enron affiliate, Finven, was a mechanism for infusing money into SECLP: SCD would in effect sell 35% of its interest in SECLP to Finven, and either repurchase it by November 1997 or receive $50,000 in consideration from Finven. SCD proved unable to repurchase its interest, and a dispute arose between it and Finven. As a result, the two entities proceeded to arbitration in June 1998.[2] That arbitration took place under the contract creating the Holding Partnership and its result is not the subject of this appeal.

Shortly after the debacle for SCI in the arbitration with Finven and with SCI's position in SECLP apparently eroding, SCI filed the Dominican Lawsuit in July 1998. In that suit, SCI named all of the petitioners in the instant case as defendants, referring to them throughout the complaint as "Enron," "the Enron Group," "the Enron companies," and describing them as affiliates. In its complaint in that action, SCI alleged that it was coerced into the SECLP partnership by Enron, that all

of SCI's Agreements with Enron were fraudulently induced, and that Enron tortiously interfered with SCI's negotiations with CDE. SCI demanded rescission of the Project Agreement, the 1993 Agreement and the 1994 Agreement and approximately $159 million in damages.

Whereupon we arrive at the instant action. In August 1998, SECLP and Enron filed a petition in the Southern District to compel arbitration of the dispute with SCI and to enjoin SCI from prosecuting the Dominican Lawsuit. In the district court, Enron argued that under the broad arbitration clause in the 1993 and 1994 Agreements, SCI is bound to arbitrate its dispute with Enron. After oral argument in November 1998, Judge Casey ruled from the bench, granting Enron's motion to compel arbitration and enjoining SCI from prosecuting the Dominican Lawsuit. This appeal followed.

## II. Discussion

On appeal, SCI argues that there is no federal subject matter jurisdiction over this action because the 1994 Agreement is not "centered" in a state that is a signatory to the Convention. Next, SCI claims that because none of the petitioners are currently signatories to the 1994 Agreement as a result of the various transactions outlined above, they no longer have the right to compel arbitration of disputes under that Agreement. Finally, SCI argues that its claims in the Dominican Lawsuit are based upon Enron's actions that predate the 1994 Agreement and thus are beyond the scope of the arbitration clause. We treat these claims in separate sections below.

### A. Jurisdiction under the Convention

SCI argues that the district court did not have subject matter jurisdiction over this dispute. SCI and Enron agree that

---

**2.** According to the record before us, that arbitration took place in New York before the Honorable Abraham Sofaer. During the arbitration, SCD conceded Finven's rights under the Holding Partnership. Judge Sofaer awarded Finven $300,000 in attorney's fees which has not yet been paid by SCD.

the only basis for federal jurisdiction, if it exists, is Chapter Two of the FAA, 9 U.S.C. §§ 201–208.[3] Section 201 provides for the enforcement of the Convention.[4] Section 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." In considering whether the Convention applies to this arbitration, we are mindful that "[t]he goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions," *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 250 (2d Cir.), cert. dismissed, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991), and to "unify the standards by which agreements to arbitrate are observed." *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). The adoption of the Convention by the United States promotes the strong federal policy favoring arbitration of disputes, particularly in the international context. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 638–40, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

▮ A district court may compel arbitration under Chapter Two of the FAA pursuant to 9 U.S.C. § 206, which provides:

> A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.

Section 202 defines the type of arbitration agreements that fall under Chapter Two of the FAA:

> An arbitration agreement or arbitral award arising out of a legal relatiohship,

whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

The Convention and the implementing provisions of the FAA set forth four basic requirements for enforcement of arbitration agreements under the Convention: (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope. *Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982); see also *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993). We agree with (then Chief) Judge Coffin in *Ledee* that a district court's scope of inquiry in considering a petition to compel arbitration under Chapter Two of the FAA is "very limited." 684 F.2d at 186. Although the various agreements between SCI and Enron satisfy these four requirements, SCI nonetheless claims that the district court lacked jurisdiction.

▮ SCI invites us to employ a "center of gravity" test to determine whether the instant arbitration falls under the Convention. SCI's "center of gravity" test, which it does not clearly define, apparently would require the subject matter of the arbitration, or the parties to the arbitration, or both, to be located in a State that also is a signatory to the Convention. SCI and

---

**3.** SCI claims that diversity is lacking and Enron does not contest that point.

**4.** Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be

enforced in United States courts in accordance with this chapter." The full text of the Convention may be found immediately following 9 U.S.C. § 201.

SECLP are incorporated in the British Virgin Islands and the Turks and Caicos Islands respectively, and the location of the power plant is in the Dominican Republic, none of which is a signatory to the Convention.[5] Accordingly, SCI argues, this dispute lies beyond the scope of the Convention. Enron responds that (1) the only State that must be a signatory to the Convention is the State where the arbitration is to take place, the second requirement mentioned in *Ledee;* and (2) as the Agreements between the parties provided for arbitration in the United States (specifically in New York City), which is a signatory to the Convention, there is federal jurisdiction. For the reasons stated below, we agree with Enron and decline to adopt SCI's "center of gravity" test.

 The starting point in construing a treaty is its text. *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). The relevant portion of the Convention is Article II, which governs an action to enforce an arbitration agreement. Article II provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Thus, in Article II the "Contracting State" concept appears only to designate the location of the court where "recognition" of an agreement in writing to arbitrate is sought. The purpose behind this drafting choice is clear: the courts of a signatory to the Convention should abide by its goal of enforcing international agreements to arbitrate disputes. Similarly, the FAA in 9 U.S.C. § 202 makes no mention of a requirement that the arbitration involve parties subject to the jurisdiction of Contracting States or that the location of the dispute be "centered" in such a State. While 9 U.S.C. § 202 explicitly excludes domestic disputes from Chapter Two of the FAA, it does not make any distinctions among foreign disputes or foreign parties.

SCI's effort to import a "center of gravity" test into application of the Convention is further weakened by the Convention's history. The Convention was drafted to eliminate many of the problems that hindered enforcement of its predecessor, the Geneva Convention of 1927. See Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1055–61 (1961). Most importantly, the Convention eliminated the requirement in the Geneva Convention that the parties be subject to the jurisdiction of Contracting States. See Cindy Silverstein, Comment, Iran Aircraft Industries v. Avco Corporation: Was a Violation of Due Process Due?, 20 Brook. J. Int'l L. 443, 453–54 (1994); see also Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 8–9 (1994). Under Article II of the Convention, the citizenship of the parties to the agreement and the location of

---

5. The United Kingdom, a signatory to the Convention, did not extend it to its dependencies, the Turks and Caicos Islands and the British Virgin Islands. See Note 28 to the Convention.

the disputed subject matter are not controlling.

In *La Societe Nationale Pour La Recherche v. Shaheen Natural Resources Co.,* 733 F.2d 260 (2d Cir.1984)(per curiam), this court affirmed a judgment of the Southern District "for the reasons set forth" in the opinion of the district judge, reported at 585 F.Supp. 57. In that case, Judge Duffy had confirmed an arbitral award in favor of plaintiff, a company owned by the Algerian government, a nonsignatory to the Convention. The contract between the parties involved the sale of crude oil by the plaintiff to the defendant, an Illinois company with its principal place of business in New York. The contract provided for arbitration in Geneva, Switzerland (a signatory State) under Algerian law. The defendant in that case argued that the plaintiff could not invoke the Convention against it "because as an arm of the Algerian government," plaintiff was not a party to the Convention. *Id.* at 64. Although the context for the decision was Article I of the Convention, which deals with arbitral *awards* rather than with arbitration *agreements,* the court's reasoning applies with equal force to the rest of the Convention: "The focus of ... the Convention is not on the nationality of the party seeking to enforce an award but on the *situs of the arbitration.* Indeed, arbitration awards rendered by panels sitting in contracting countries have been confirmed consistently when the plaintiff is a national of a country which has not acceded to the Convention." *Id.* (emphasis added); see also *Imperial Ethiopian Gov't v. Baruch–Foster Corp.,* 535 F.2d 334, 335 (5th Cir.1976)(confirming an arbitral award in favor of the Ethiopian government, a non-signatory); *In re Arbitration Between: Trans Chemical Ltd. and China Nat'l Mach. Import & Export Corp.,* 978 F.Supp. 266 (S.D.Tex.1997), aff'd, 161 F.3d 314 (5th Cir.1998)(confirming arbitral award in favor of Pakistani corporation and against Chinese corporation regarding construction of a plant in Pakistan, a nonsignatory); *National Oil Corp. v. Libyan Sun Oil Co.,* 733 F.Supp. 800 (D.Del.1990)(enforcing an arbitration award in favor of a company in Libya, a nonsignatory). We have previously applied the Convention to an arbitration between two foreign companies without commenting at all about the contracting status of any of the states involved. See, e.g., *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928 (2d Cir.1983)(confirming award between two foreign companies); see also *Jain v. de Mere,* 51 F.3d 686 (7th Cir.1995)(compelling arbitration between French and Indian citizens).

The Convention's sweeping approach toward arbitral agreements in Article II and arbitral awards in Article I led many of the signatory states, including the United States, to adopt certain reservations to its implementation. One such reservation, the exclusion from the Convention of arbitral agreements and awards that are entirely domestic in scope, see *Ledee,* 684 F.2d at 187, has already been mentioned. The United States also adopted the reservation provision in Article I(3) of the Convention, governing arbitral *awards,* which provides that "any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." See Note 29 to the Convention. SCI relies on this "reciprocity" provision to bolster its argument that the United States cannot enforce SCI's Agreements with Enron unless there is another "Contracting State" involved in the dispute.

SCI's reliance on the "reciprocity" provision is misplaced. First, it is questionable whether that provision, which is found only in Article I of the Convention, even applies to Article II. But even if it did, the reciprocity provision does not contemplate the "center of gravity" test suggested by SCI. All that the reciprocity provision requires is that the award be granted in a "Contracting State." In this case, the arbitration agreements between SCI and Enron

contemplated arbitration in the United States—a signatory to the Convention. If the arbitration results in an award, it will have been granted in a signatory State and will be enforceable either here or in another Contracting State. *Bergesen,* 710 F.2d at 933–34 (awards rendered in the United States under the Convention may be enforced in the United States as long as there is substantial foreign nexus to the arbitration).

To support its "center of gravity" test, SCI also relies on the refusal of the Fifth Circuit to compel arbitration in Mississippi in *National Iranian Oil Co. v. Ashland Oil, Inc.,* 817 F.2d 326 (5th Cir.1987). However, the contract in *National Iranian* provided for arbitration in Iran, a non-signatory to the Convention. This is a far cry from holding that an Iranian company could not be compelled to arbitrate a claim in the United States, if it has contracted to do so. Indeed, in dicta, *National Iranian* suggested it could be so compelled. 817 F.2d at 334.

Thus, since the 1993 and the 1994 Agreements satisfied all the requirements set forth in *Ledee*—particularly as they call for arbitration in New York—we conclude that the district court had jurisdiction under the Convention and the implementing provisions of the FAA.

### B. Do the Enron Petitioners Have the Right to Compel SCI to Arbitrate?

SCI's second principal argument on appeal is that there is no valid and enforceable agreement to arbitrate between the parties to this proceeding. SCI argues that (1) the only valid agreement respecting SECLP currently in effect is the 1994 Agreement, because it superseded the earlier Agreements;[6] (2) the only Enron signatories to the 1994 Agreement, ACF and ER, have assigned their rights under that

Agreement to EDR and EDRO (who are not petitioners here); (3) therefore, none of the Enron petitioners have the right to enforce a contract to arbitrate to which they are not now parties.

In considering whether "a particular dispute is arbitrable," a court must first decide "whether the parties agreed to arbitrate." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 294 (2d Cir.1999); see also *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1063 (2d Cir.1993). We have held that whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate. *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 677 (2d Cir. 1972); *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir. 1980).

Unquestionably, there were a number of enforceable contracts between SCI (and its affiliate, SCD) and various Enron entities, each of which contained an agreement to arbitrate. The assignments of rights under the 1994 Agreement from one set of affiliates to another set of affiliates do not negate the prior existence of a contract to arbitrate between the parties, and thus do not fall comfortably within the inquiry into the making of an agreement. The question before us is not whether SCI and the Enron petitioners entered into an agreement to arbitrate—they did (and more than once)—but whether subsequent events deprived all of the Enron petitioners of the right to compel SCI to live up to that agreement.

#### 1. Choice of Law

Before we turn to that question, we must first resolve a threshold issue con-

---

**6.** In *McAllister Bros., Inc. v. A&S Transp. Co.,* 621 F.2d 519, 523 (2nd Cir.1980), we held that a claim of "abandonment" of a contract that had concededly been made between the parties should be decided by the arbitrator. It is thus arguable that SCI's claim that the

1994 Agreement superseded the previous Agreements is for the arbitrator to decide. However, the Enron petitioners do not press that contention, and we need not reach it as we find that Enron may compel arbitration under the 1994 Agreement.

cerning applicable law. SCI argues that state contract law principles generally apply in an inquiry into the making of the agreement. See *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996); *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). SCI suggests that we must use New York's choice of law to determine the applicable body of contract law, and that New York's choice of law points to the Turks and Caicos Islands. Alternatively, SCI argues that the 1994 Agreement itself provides that "matters relating to the formation and organization of the Partnership shall be governed by the [Turks and Caicos] Act." However, neither approach has merit on this record. First, as this is a federal question case under 9 U.S.C. § 203 and not a diversity case, we see no persuasive reason to apply the law of New York simply because it is the forum of this litigation. See *Corporacion Venezolana de Fomento v. Vintero Sales Corp. et al.,* 629 F.2d 786, 795 (2d Cir.1980); *Filanto, S.p.A v. Chilewich Int'l Corp.,* 789 F.Supp. 1229, 1235–37 (S.D.N.Y.1992)(applying federal law to the question of whether a contract is enforceable in a case arising under the Convention); cf. *Pescatore v. Pan Am. World Airways,* 97 F.3d 1, 12 (2d Cir.1996)(noting that the law is unsettled when it comes to applying federal common law or state common law in non-diversity cases). Second, the contractual provision on which SCI relies relates to "the formation and organization of the Partnership." But the partnership here—SECLP—was formed and organized well before the assignments, so that language does not apply. Rather, the primary question before us relates to the effect of the assignments on rights and duties flowing from the arbitration clause in the 1994 Agreement.

When we exercise jurisdiction under Chapter Two of the FAA, we have compel-

ling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable. See *David L. Threlkeld & Co.,* 923 F.2d at 249–50 (holding Convention and FAA preempt Vermont statute); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845–46 (2d Cir.1987)(applying federal common law in case arising under the Convention); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.,* 974 F.Supp. 293, 299 n. 5 (S.D.N.Y.1997)("[W]here jurisdiction is alleged under chapter 2 of the Federal Arbitration Act the issue of enforceability and validity of the arbitration clause is governed by federal law.") Under the circumstances here, where there is little connection to the forum and the Agreements between the parties state an intention to be governed by the FAA, proceeding otherwise would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law.

In this case, the 1994 Agreement's dispute resolution provision provided that arbitration "shall for all purposes be governed by, and construed and enforced in accordance with, the Federal Arbitration Act ("FAA"), and matters of interpretation of the provisions of this Agreement shall be governed by Texas law in any such arbitration." It is thus clear that neither party intended New York law, procedural or otherwise, to govern any aspect of their dispute. As no party is domiciled in New York, and no transactions have taken place here, New York has no connection to this litigation other than it is the location of the arbitration. While the language quoted immediately above might justify looking to Texas law on assignments, neither party argued that it applied. Thus, we will apply the body of federal law under the FAA.[7]

**7.** We doubt our result would be any different were we to look at Texas law. The Texas Supreme Court has several times announced its pro-arbitration policy and the primacy of

the FAA where an arbitration agreement provides that it is governed by both Texas law and the FAA. See, e.g., *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90–91

2. Enron's Right to Compel Arbitration.

■ Having determined that federal law applies, we turn now to the effect of the assignments on the right of the Enron petitioners to compel arbitration under the 1994 Agreement. Even if we accept arguendo SCI's claim that the Enron petitioners are not signatories to the 1994 Agreement, that does not end the matter.[8] In this circuit, we have repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to "ordinary principles of contract and agency." *McAllister Bros.,* 621 F.2d at 524; *Deloitte Noraudit A/S,* 9 F.3d at 1064. These principles include "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995). We believe that a number of these concepts justify allowing the Enron petitioners to compel SCI to arbitrate its claims asserted against them in the Dominican Lawsuit.

■ In applying these concepts, we note, as we did in *Thomson–CSF* with respect to "veil-piercing," that such determinations are often "fact specific" and differ with "the circumstances of each case." 64 F.3d at 777–78 (citation omitted). More importantly, while a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party, we do not face that concern here. SCI is the party trying to escape its obligation to arbitrate, but it (and/or its affiliate SCD) was a signatory to all three arbitration Agreements with Enron—that is, the Project Agreement, the 1993 Agreement and, most importantly, the 1994 Agreement.[9] Normally, it is the signatory to an arbitration agreement that urges us to apply a

veil-piercing doctrine, see, e.g., Thomson–CSF, 64 F.3d at 777–78, to require the non-signatory to arbitrate because of the special circumstances that apply. In this case, however, it is the Enron petitioners (the alleged "non-signatories" to the contract) that invite us to pierce their own corporate veil because of claimed special circumstances.

Enron argues that the corporate relationship among the various Enron affiliates justifies allowing the Enron petitioners to invoke the arbitration clause in the 1994 Agreement. The identity of interests between petitioners and the current Enron signatories to the 1994 Agreement (EDR and EDRO) is nowhere more apparent than on the assignment instruments themselves: the signatures of the assignors in the assignments from ACF and ER to EDR and EDRO are the same as the signatures for the assignees. Similarly, virtually all the correspondence between SCI and the various Enron petitioners is mailed to the same address in Texas, "c/o Enron Development Corp." Perhaps most telling is SCI's own reference to the various Enron companies in its complaint in the Dominican Lawsuit as the "Enron Group," "affiliates," and "Enron." In the Dominican Lawsuit, SCI treated a group of related companies as though they were interchangeable, but now it asks for strict adherence to the corporate form in its opposition to arbitration. On this record, that is not called for. We believe that all the circumstances here justify piercing the corporate veil.

■ In addition, Enron's claim that SCI should be estopped from resisting arbitration is equally, if not more, compelling. In *Thomson–CSF* we set forth two types of estoppel cases. 64 F.3d at 778–79. The

---

(Tex.1996)(applying the FAA to question of waiver of arbitration).

**8.** Of course, two of the Enron petitioners (ACF and ER) *did* sign the 1994 Agreement, but later assigned their interests to two other Enron affiliates, EDR and EDRO.

**9.** SCD was the only "Smith Cogeneration" signatory on the 1993 Agreement. SCI was a signatory on the Project Agreement and the 1994 Agreement.

more typical case, as we have already noted, arises when a signatory to an arbitration agreement seeks to bind a non-signatory to it. We have held that the non-signatory may be compelled to arbitrate when it has derived other benefits under the agreement containing the arbitration clause. See *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999); *Deloitte Noraudit A/S,* 9 F.3d at 1064. But even when a non-signatory seeks to compel arbitration with a signatory, we pointed out that the Fourth and Eleventh Circuits "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson–CSF,* 64 F.3d at 779 (referring to *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988)). We find that this case falls within the latter category.

In the Dominican Lawsuit, SCI asked for the "nullification or rescission of all of the agreements entered into between [SCI] and its related companies and persons related to [Enron] and any other entity or person of the Enron Group," and sued all the Enron signatories to the Project Agreement, 1993 Agreement and the 1994 Agreement except for EDR and EDRO, the most recent signatories to the 1994 Agreement. It is clear that the Enron defendants in the Dominican Lawsuit are the ones entitled to relief, as the subject matter of that lawsuit arises under all of those Agreements, particularly the 1994 Agreement. Further, as already stated, by treating the Enron entities as a single unit in its complaint in the Dominican Lawsuit, SCI is estopped from claiming that the current signatories to the 1994 Agreement are distinct from the defendants in the Dominican Lawsuit. Therefore, we conclude that SCI cannot now shield itself from arbitration by arguing that only the 1994 Agreement contains an enforceable arbitration clause, and that only EDR and EDRO—the parties SCI intentionally did not sue in the Dominican Lawsuit—would have the right to invoke it. Cf. *IDS Life Ins. Co. v. SunAmerica, Inc.,* 103 F.3d 524, 530 (7th Cir.1996)(Posner, C.J.)(where a party to an arbitration agreement attempts to avoid that agreement by suing a "related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration. Such a maneuver should not be allowed to succeed. . . .").

For these reasons, we affirm the district court's ruling that the Enron petitioners have the right to compel SCI to arbitrate.

C. Are SCI's Claims in the Dominican Lawsuit within the Scope of the 1994 Arbitration Agreement?

Finally, SCI argues that the claims it asserted against Enron in the Dominican Lawsuit are not arbitrable because they are not covered by the arbitration provision in the 1994 Agreement. These claims are that SCI was coerced into the SECLP partnership by Enron, that all of SCI's Agreements with Enron were fraudulently induced, and that Enron tortiously interfered with SCI's negotiations with CDE.

The 1994 Agreement provides in relevant part:

11.14· *Dispute Resolution* (a) In the event of any dispute, disagreement, controversy or claim arising under or relating to any obligation or claimed obligation under the provisions of this Agreement (a *"Dispute"* which term shall include any tort claim relating to or in connection with this Agreement . . . ), the party seeking resolution of such Dispute shall give notice to the other party . . . .

. . . .

(c) Any Dispute that is not resolved by the parties shall be finally settled by arbitration.

Despite this broad language and the explicit reference to "any tort claim," SCI contends that its claims in the Dominican Lawsuit fall outside the scope of this language. SCI argues that because Enron's alleged improper actions took place in 1993, prior to the signing of the 1994 Agreement, the arbitration provision does not cover them.

We have stated previously that in light of "the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997) (citations and internal quotation marks omitted). We stated in *Genesco* that when we consider "whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them." 815 F.2d at 846 (citation omitted).

 SCI's argument that its claims against Enron concern events that predate the 1994 Agreement does not persuade us that the district court erred here in ordering arbitration. In *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir.1972), we held that arbitration under the New York Stock Exchange Rules applied to actions predating the signing of the contract by the petitioner because the contract stated that it governed "any controversy" between the parties. As the arbitration clause here similarly does not contain any temporal limitation, the relevant inquiry is whether SCI's claims "relat[e] to any obligation or claimed obligation under" the 1994 Agreement, not when they arose. We think it is evident that SCI's claims in the Dominican Lawsuit fall within this broad language. Further, as fraudulent inducement claims necessarily involve actions that predate the signing of a contract, taking SCI's argument to its logical extreme would mean that such claims are generally non-arbitrable. Yet, the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), held that claims of fraudulent inducement of a contract generally, as opposed to fraudulent inducement of the arbitration clause specifically, are arbitrable. SCI's claims in the Dominican Lawsuit relate to the inducement of the 1994 Agreement as a whole. Thus, resolving any doubt with respect to the scope of the arbitration clause in favor of arbitration, we find that SCI's claims in the Dominican Lawsuit are arbitrable.

### III. Conclusion

We affirm the decision of the district court to compel arbitration and enjoin SCI from prosecuting the action in the Dominican Republic. We conclude that there is federal jurisdiction under the Convention and the FAA. The assignments under the 1994 Agreement do not prevent Enron from invoking the arbitration clause in that Agreement; in any event, we find that SCI is estopped from raising this claim. Finally, SCI's claims in the Dominican Lawsuit fall within the scope of the arbitration clause in the 1994 Agreement. We have considered all of SCI's claims and find them without merit.