387 F.3d 163
 JLM INDUSTRIES, INC., JLM International, Inc., JLM Industries (Europe) BV, JLM Europe BV, and Tolson Holland, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,
v.
STOLT-NIELSEN SA, Stolt-Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co. Ltd., Defendants-Appellants.
 No. 03-7683(L).
 No. 03-7913(CON).
 United States Court of Appeals, Second Circuit.
 Argued: February 3, 2004.
 Decided: October 26, 2004.
 
 Appeal from the United States District Court for the District of Connecticut, Dominic J. Squatrito, J. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED J. Douglas Richards (Michael M. Buchman, on the brief), Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Eric D. Grayson, Grayson & Associates, P.C., Greenwich, CT. for Plaintiffs-Appellees.
 Christopher M. Curran (J. Mark Gidley and Peter J. Carney, on the brief), White & Case LLP, Washington, D.C., for Defendants-Appellants Stolt-Nielsen SA and Stolt-Nielsen Transportation Group Ltd.
 Steven F. Cherry, Wilmer, Cutler & Pickering, McLean, VA, William J. Kolasky (Edward C. DuMont, on the brief), Wilmer, Cutler & Pickering, Washington, D.C., for Defendants-Appellants Odfjell ASA and Odfjell USA, Inc.
 Robert A. White (C. Donald Neville, on the brief), Murtha Cullina LLP, Hartford, CT, for Defendants-Appellants Jo Tankers BV and Jo Tankers, Inc.
 Sheila A. Huddleston (Paul D. Sanson, on the brief), Shipman & Goodwin LLP, Hartford, CT, for Defendant-Appellant Tokyo Marine Co., Ltd.
 POOLER, SOTOMAYOR, and WESLEY, Circuit Judges.
 POOLER, Circuit Judge.
 
 BACKGROUND
 
 1
 The named plaintiffs in this putative class action (collectively referred to hereinafter as "JLM"), are affiliated corporations which, according to the amended complaint, are "in the business of shipping, buying, selling and trading chemicals in bulk. The chemicals in bulk are shipped via parcel tankers to and from ports in the United States and to and from international ports."[1] JLM undertakes these shipments by contracting with the owners of parcel tankers to lease space on board a tanker for a certain voyage. The four defendants in this action (collectively referred to hereinafter as "the Owners") are alleged by JLM to be among "the world's largest ocean carriers of liquid chemicals" via parcel tanker.[2] Indeed, JLM contends in its brief before this Court that "the international parcel tanker service industry, which has annual revenues of more than $2.5 billion ... is dominated by [the Owners], who together comprise more than two thirds of the market."
 
 
 2
 The individual shipping transactions at issue were each governed by a standard form contract, which is known in the parcel tanker industry as the "ASBATANKVOY," and which is published by the Association of Ship Brokers & Agents (U.S.A.), Inc. This contract consists of two parts. Part I sets forth the terms of a particular shipment, such as the nature of the freight being shipped, expected departure and arrival dates, and freight rates. Part II sets forth a number of standard conditions and warranties. Among these is an arbitration clause, which in relevant part reads as follows:
 
 
 3
 24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final.
 
 
 4
 It is undisputed that each charter contract entered into between JLM and the Owners specified either London or New York as the place of arbitration.
 
 
 5
 As declared in the amended complaint, JLM filed this action in order to vindicate "the benefits of free and unrestrained competition in the international parcel tanker service market." JLM's central allegation is that the Owners have exploited their market power by entering into
 
 
 6
 a continuing agreement, understanding and conspiracy to: (i) fix, raise, maintain or stabilize the worldwide freight rates or price of ocean shipping services for the transportation of liquid chemicals via parcel tanker ("parcel tanker service"); (ii) coordinate worldwide bidding for the provision of ocean shipping services for parcel tanker service provided by [the Owners]; (iii) not compete with one another in the international parcel tanker service market; and (iv) allocate their parcel tanker service customer by customer, trade lane by trade lane and route by route and otherwise "carve up" the worldwide market between one another....
 
 
 7
 Based upon this allegation, JLM states four causes of action: (1) a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in that the Owners "have engaged in a horizontal contract, combination or conspiracy in unreasonable restraint of trade"; (2) violations of Sections 35-26 and 35-28 of the Connecticut Antitrust Act, Conn. Gen.Stat. §§ 35-24-35-49; (3) a common law claim for unjust enrichment; and (4) a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42-110a-42-110q.[3]
 
 
 8
 Pursuant to Rule 23 of the Federal Rules of Civil Procedure, JLM seeks to represent the following plaintiff class:
 
 
 9
 All persons or entities who paid freight and/or purchased ocean shipping services for the transportation of liquid chemicals via parcel tanker to and from the United States and to and from international ports from [the Owners], their co-conspirators, predecessors or controlled subsidiaries or affiliates from January 1, 1998 and continuing to present.
 
 
 10
 JLM does not specify the potential number of class members except to plead upon information and belief that "there are hundred's [sic] of individuals or entities in the United States and around the world who purchased parcel tanker service" from the Owners during the proposed class period. Further, JLM does not allege how many shipping transactions it has so far conducted with the Owners during the proposed class period, but an affidavit filed in the district court by JLM's head of charter operations puts the number at "nearly 80."
 
 
 11
 Prior to any determination as to certification of the proposed class, certain of the Owners moved to compel arbitration of all of JLM's claims pursuant to the terms of the ASBATANKVOY's arbitration clause. The district court denied these motions in an unreported opinion, concluding that price-fixing allegations against the Owners fall outside the scope of the arbitration clause. Specifically, the district court held that it would be improper to compel arbitration because "JLM's [Sherman Act] claim in no way depends upon interpretation, construction, or application of any provision of the [ASBATANKVOY]." The district court did not rule on JLM's remaining claims. These interlocutory appeals followed.[4]
 
 DISCUSSION
 
 12
 We have jurisdiction over these consolidated appeals under the Federal Arbitration Act ("the FAA"), 9 U.S.C. §§ 1-16, 201-08, 301-07, which allows an interlocutory appeal from a district court's denial of a motion to compel arbitration. 9 U.S.C. § 16(a)(1)(A), (B). "We review a district court's determination of arbitrability de novo." Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 147 (2d Cir.2004). In order to determine whether all or part of the instant action should be sent to arbitration, the Court must conduct the following inquiries:
 
 
 13
 [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.
 
 
 14
 Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 75-76 (2d Cir.1998). We now consider each of these inquiries and conclude that the district court erred in holding that arbitration is not appropriate in the instant case.
 
 
 15
 I. Did the Parties Agree to Arbitrate?
 
 
 16
 As already noted, the ASBATANKVOY contains an arbitration clause. JLM argues, however, that the clause should not be summarily enforced because "[f]acts germane to whether the arbitration agreements here were contracts of adhesion are in sharp dispute." In order to resolve these factual disputes, JLM contends that "an evidentiary hearing should be held," presumably by the district court upon remand.
 
 
 17
 We are unpersuaded by this argument. First, we note that a contract of adhesion
 
 
 18
 is a contract formed as a product of a gross inequality of bargaining power between parties. A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable. Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms.
 
 
 19
 Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir.1997) (internal citations and quotation marks omitted).
 
 
 20
 Although JLM's brief is not wholly clear on this point, we understand its argument to be that the ASBATANKVOY as a whole amounts to a contract of adhesion, rather than that the arbitration clause alone so qualifies. Thus, an affidavit filed by JLM International, Inc.'s Vice President of Trading declares as follows:
 
 
 21
 Because the owners, such as the subsidiaries of Stolt, Odfjell, Jo Tankers and Tokyo all use a standard form charter, the ASBATANKVOY form, every charterer has to accept arbitration or they will not be offered a ship.... The ABSTANKAVOY form was developed by shipowners and is the form used in shipping liquified products.
 
 
 22
 * * *
 
 
 23
 Because the shipowners control the form, . . . [the plaintiffs] are forced to accept arbitration, or else we cannot ship our products.... [W]e have no choice but to accept the arbitration clauses that are printed in the form contract. Our lack of leverage or alternatives with these Defendants with which to negotiate regarding arbitration clauses thus appears in substantial degree to have been reinforced by the same anticompetitive agreement we challenge in this case.
 
 
 24
 We take this to be an assertion that the ASBATANKVOY itself, and not merely the arbitration clause included therein, has been forced upon JLM. According to the principle announced in Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the issue of whether the ASBATANKVOY — as opposed to the arbitration clause alone — is a contract of adhesion is itself an arbitrable matter not properly considered by a court.
 
 
 25
 In Prima Paint, the Supreme Court considered whether a claim that a party had been fraudulently induced into signing a contract containing an arbitration clause could be referred to arbitration. We recently explained the Court's holding in favor of arbitration as follows:
 
 
 26
 It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself — an issue which goes to the `making' of the agreement to arbitrate — the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally."). This is true because "arbitration clauses as a matter of federal law are `separable' from the contracts in which they are embedded, and ... where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud. Id. at 402, 87 S.Ct. 1801."
 
 
 27
 ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 29 (2d Cir.2002) (parallel citations omitted); see also Campaniello Imps., Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 667 (2d Cir. 1997) ("Since there is no fraud or misrepresentation that relates directly to the arbitration clause," district court properly sent case to arbitration).
 
 
 28
 "Claims of unconscionability and adhesion contracts are similarly included within the Prima Paint rule." Wright v. SFX Entm't Inc., No. 00 CIV 5354, 2001 WL 103433, at *3 (S.D.N.Y. Feb. 7, 2001) (citing cases). Accordingly, JLM's claim that the ASBATANKVOY is a contract of adhesion is an issue for the arbitral panel to decide.[5]
 
 
 29
 II. The Scope of the Arbitration Agreement.
 
 
 30
 1. Does the Arbitration Clause Extend to Sherman Act Claims?
 
 
 31
 While the question of whether the ASBATANKVOY is a contract of adhesion is for an arbitrator, "a disagreement about whether an arbitration clause... applies to a particular type of controversy is for the court." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). Our inquiry is governed by the principle that, under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This principle is based upon the fact that the FAA is an expression of "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir.2001). Moreover, as our Court has recently repeated, we are mindful that "[t]he federal policy favoring the liberal enforcement of arbitration clauses... applies with particular force in international disputes." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 654 (2d Cir.2004); see also David L. Threlkeld, 923 F.2d at 248 ("Enforcement of international arbitral agreements promotes the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation.").
 
 
 32
 Still, it remains the case that arbitration "is a matter of consent, not coercion." Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Specifically, "`arbitration is a matter of contract,'" and therefore "`a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" Vera v. Saks & Co., 335 F.3d 109, 116 (2d Cir.2003) (quoting Transit Mix Concrete Corp. v. Local Union No. 282, 809 F.2d 963, 967 (2d Cir.1987)). Thus, "[w]hile the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA `was to make arbitration agreements as enforceable as other contracts, but not more so.'" Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 364 (2d Cir.2003) (quoting Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 369 (2d Cir.2003); further internal quotation omitted).
 
 
 33
 We also note that JLM directs our attention to an investigation by the United States Department of Justice of alleged price-fixing activities undertaken by the Owners. Presumably, JLM does this in order to establish that its claims against the Owners are meritorious. We stress, however, that our determination of the arbitrability of the claims asserted by JLM does not in any way rest upon the strength of those claims. The arbitration clause at issue directs that "`[a]ny and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration...." We therefore "have no business weighing the merits of [JLM's] grievance[s].... The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'" AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added) (quoting Steelworkers v. Am. Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)); see also St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc., 270 F.3d 621, 624 (8th Cir.2001) ("[T]he court may not rule on the merits of any claim the parties have agreed to arbitrate.").
 
 
 34
 With these threshold principles in mind, we turn to the arbitration clause itself. In determining whether JLM's claims fall within the scope of the clause, we proceed as follows:
 
 
 35
 [R]ecognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow.... Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.
 
 
 36
 Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir.2001) (internal quotation marks and citations omitted).
 
 
 37
 Again, the arbitration clause at issue in this case provides that "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" are subject to arbitration. This language is at least as expansive as the language contained in a number of arbitration clauses that this Court has characterized as "broad." See, e.g., Paramedics Electromedicina, 369 F.3d at 649 ("any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement"); Vera, 335 F.3d at 117 ("[a]ny dispute, claim, grievance or difference arising out of or relating to the Agreement"); Louis Dreyfus Negoce S.A., 252 F.3d at 225 ("[a]ny dispute arising from the making, performance or termination of this Charter Party") (internal quotations omitted); Oldroyd, 134 F.3d at 76 ("[a]ny dispute, controversy or claim arising under or in connection with" agreement).
 
 
 38
 Because the ASBATANKVOY's arbitration clause is broad, its coverage extends to "collateral matters." Louis Dreyfus Negoce S.A., 252 F.3d at 224. Our Circuit has not precisely defined this phrase. We have made it plain, however, that where the arbitration clause at issue is a broad one, it is presumptively applicable to disputes involving matters going beyond the "interpret[ation] or enforce[ment of] particular provisions" of the contract which contains the arbitration clause. Oldroyd, 134 F.3d at 77. We have said that "[i]f the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them." Id. (citation, internal quotation marks, and brackets omitted).
 
 
 39
 JLM points out that we have doubted the utility of phrases such as "touch matters" in determining whether a broad arbitration clause is applicable to a dispute which departs from the casebook model of a contract dispute because the applicability of such an arbitration clause cannot be resolved simply through the interpretation and enforcement of contract language. Specifically, we have found that "touch matters" and like phrases do not "yield[] a principled way of ... deciding whether ... claims should be sent to arbitration." Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 28 (2d Cir. 1995).
 
 
 40
 This point is well taken, but, based upon Supreme Court precedent and cases from our Circuit, we are confident that the district court erred in holding that the instant dispute should not be sent to arbitration. In reaching this conclusion, "we focus on the factual allegations in the complaint rather than the legal causes of action asserted." Oldroyd, 134 F.3d at 77 (citation and quotation marks omitted). The central factual allegations of the complaint in this case posit that a price-fixing conspiracy among the Owners undermined legitimate contractual relations between the parties. These allegations are directly analogous to the facts of a number of cases in which arbitration has been ordered.
 
 
 41
 We begin with Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). That case dealt with a dispute between a Japanese automobile manufacturer ("Mitsubishi") and a Puerto Rican automobile dealership ("Soler"). The contract between the parties included a broad arbitration clause, which provided that "[a]ll disputes, controversies or differences which may arise ... out of or in relation to" the parties' contractual relationship were to be arbitrated. Id. at 617, 105 S.Ct. 3346. A dispute arose between the parties, which came to include a claim by Soler that Mitsubishi and its affiliate ("CISA") had engaged in a conspiracy in violation of the Sherman Act. Specifically, Soler alleged the existence of a comprehensive scheme to restrain trade which implicated matters well beyond those relating to the automobile distribution contract between Soler and Mitsubishi:
 
 
 42
 In the counterclaim premised on the Sherman Act, Soler alleged that Mitsubishi and CISA had conspired to divide markets in restraint of trade. To effectuate the plan, according to Soler, Mitsubishi had refused to permit Soler to resell to buyers in North, Central, or South America vehicles it had obligated itself to purchase from Mitsubishi; had refused to ship ordered vehicles or the parts, such as heaters and defoggers, that would be necessary to permit Soler to make its vehicles suitable for resale outside Puerto Rico; and had coercively attempted to replace Soler and its other Puerto Rico distributors with a wholly owned subsidiary which would serve as the exclusive Mitsubishi distributor in Puerto Rico.
 
 
 43
 Id. at 620, 105 S.Ct. 3346.
 
 
 44
 The Supreme Court commented that, in holding that these claims were arbitrable, the First Circuit Court of Appeals had acted correctly because "insofar as the allegations underlying the [Sherman Act] claims touch matters covered by the [terms of the contract between the parties], the Court of Appeals properly resolved any doubts in favor of arbitrability." Id. at 624 n. 13, 105 S.Ct. 3346. JLM points out that this comment is dictum because "Soler [did] not question the Court of Appeals' application of [the arbitration clause] to the disputes [between the parties] as a matter of standard contract interpretation." Id. at 624, 105 S.Ct. 3346. While this is correct, it is also true that our Circuit has found the Court's comment to be quite persuasive dictum. First, this language in Mitsubishi is the origin of the "touch matters" terminology to which we have already referred. Further, following Mitsubishi, our Circuit has on at least two occasions squarely held that broad arbitration clauses are applicable to factual scenarios similar to the one at issue in that case.
 
 
 45
 In Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840 (2d Cir.1987), we concluded that an alleged conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, was arbitrable. Genesco involved a series of purchase and sale agreements between a clothing manufacturer ("Genesco") and two affiliated firms — one Japanese and the other American — which served as Genesco's fabric suppliers. The arbitration clauses at issue provided that claims "arising under" and "arising out of or relating to" the agreements between the parties were subject to arbitration. Id. at 845. The RICO claim rested upon an alleged conspiracy between an officer of Genesco and the defendant firms:
 
 
 46
 These allegations state that the defendants overcharged Genesco over an extended period of time for the piece goods it had purchased from them under the purchase and sale agreements. Genesco claims that it later discovered that the prices paid were substantially above fair market value and that the piece goods were unsuitable, obsolete, out-of-season, or damaged. Defendants accomplished these overcharges and inappropriate sales, Genesco asserts, by conspiring with and bribing its vice-president for purchasing.
 
 
 47
 Id. at 846-47. While the plaintiffs thus asserted that conspiracy and bribery were at the heart of their complaint, the defendants in Genesco argued that matters relating to the agreements between the parties — overcharging and intentional supply of defective goods — formed the crux of the plaintiff's suit. Id. at 846. Finding both characterizations "essentially correct," id., we held that, especially in light of the international character of the transactions between the parties, the dispute as to the existence of this conspiracy fell within the scope of the applicable arbitration clauses. Id. at 848.
 
 
 48
 We reached a similar result with respect to the arbitrability of a RICO claim in Kerr-McGee Refining Corp. v. M/T Triumph, 924 F.2d 467 (2d Cir.1991). That case involved a charter contract for the shipment of crude oil and a dispute about whether the amount of oil agreed upon had actually been shipped by the chartered vessel. The parties — "Kerr-McGee" and "Triumph" — consented to arbitrate this discrete dispute, but, as the litigation progressed, arbitrated more matters than they had anticipated:
 
 
 49
 During the course of the arbitration, Kerr-McGee obtained information, including numerous detailed photographs of the vessel taken while it was being dismantled for scrap metal in China, that showed that a permanent concealed tank had been built into one of the vessels cargo tanks. The vessel had been further modified to allow oil to be transferred from the cargo tank to the concealed tank. In the words of the arbitration panel, "[w]hat appeared at first sight to be a fairly simple case of a short delivery developed over the seven hearings into a complex matter involving allegations of cargo stealing by this vessel, as well as other vessels operated by the same managers, perjury by the vessel's Chief Engineer, alterations to the Deck and Engine logs, etc." Because of the alleged theft of cargo, Kerr-McGee amended its claim in arbitration to recompute its damages and to seek damages under RICO.
 
 
 50
 Id. at 468-69.
 
 
 51
 The arbitration panel issued an award in favor of Kerr-McGee. Pursuant to the FAA, 9 U.S.C. § 9, Kerr-McGee then moved in federal district court for confirmation of the panel's award. The district court held that the award was improper "on the ground that the arbitration panel exceeded its power when it relied upon occurrences on other voyages not covered by the Charter in order to find" that Kerr-McGee had provided sufficient evidence to support its RICO claim. Id. at 469. We reversed because we found
 
 
 52
 that this was too restrictive a construction of the parties' intent as expressed in the Charter that "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration" (emphasis added). The dispute here was directly based on a shortage in the fuel oil delivered at the end of the single voyage covered by the Charter. It is true that Kerr-McGee thereafter obtained evidence that the shortage was intentional and part of a prior practice. This evidence, however, did not alter the facts that the dispute arose "out of" the Charter and the damages were inflicted during Triumph's performance under it. Even though the arbitration panel looked at other voyages, it did not determine the liability of a person not party to the contract, as was the case in Orion Shipping & Trading Co. v. Eastern States Petroleum Corp. of Panama, S.A., 312 F.2d 299 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705 (1963), relied on by Triumph. The award here imposes liability only on Triumph, a party to the agreement to arbitrate.
 
 
 53
 Id. at 470 (parallel citations omitted). Thus, in deciding whether an arbitration panel could consider relevant conduct by a RICO defendant that occurred prior to the execution of an arbitration agreement, we determined that the panel could consider any conduct that bears on damages. Id.
 
 
 54
 We believe that Mitsubishi, Genesco, and Kerr-McGee provide a firm basis for the conclusion that JLM's claims regarding a conspiracy among the Owners in violation of the Sherman Act are arbitrable. As in those three cases, we deal here with a broad arbitration clause and the question of its applicability to a dispute resting on factual allegations which concern matters beyond the making of a particular contract between the parties and the performance of its terms. The district court was therefore correct when it stated that the evidence supporting JLM's anti-trust claims will not focus exclusively "upon the parties' conduct under the terms of the charter." Rather, as was the case in Mitsubishi, Genesco, and Kerr-McGee, JLM will try to proffer evidence of a conspiracy which was formed independently of the specific contractual relations between the parties. Nevertheless, JLM asserts that it suffered damages as a result of this conspiracy, and it could not have suffered these damages if it had not entered into the "nearly 80" contracts with the Owners which it alleges were formed during the proposed class period. That is, the damages which JLM asserts it suffered as a result of the conspiracy among the Owners result from the fact that it entered into the charters, each of which specifies price terms which are variously characterized in the amended complaint as "artificially high" and as "overpayments." We therefore conclude that this is a dispute "arising out of" the charters, and is therefore within the scope of the ASBATANKVOY's arbitration clause.
 
 
 55
 Contrary to JLM's argument, we do not believe that Leadertex suggests a different result. In that case, two parties — "Leadertex" and "Morganton" — entered into a series of standard form sales contracts, each of which contained an arbitration clause which provided that "[a]ny controversy or claim arising under or in relation to" the contract would be subject to arbitration. 67 F.3d at 23. After a dispute arose between the parties concerning defective goods, Leadertex raised a defamation claim "based on slanderous statements Morganton allegedly had made ... when a representative of Jones New York, one of the Leadertex customers that had rejected defective finished fabric, visited the Morganton plant in North Carolina." Id.
 
 
 56
 We held that the defamation claim fell beyond the scope of the arbitration clause because Morganton's alleged statements "contained a number of charges extending beyond core issues of dyeing and finishing goods contracts: namely, that Leadertex is dishonest and incompetent, and that it acted with intent to defraud its customers." Id. at 28. That is, the statements contended, inter alia, that Leadertex was "generally dishonest in its business practices," and thus concerned "subjects other than Morganton's services for Leadertex." Id. at 28-29. Here, by contrast, JLM's Sherman Act claims unquestionably involve a core issue of the contracts between the parties-allegations that the price terms set forth in those contracts have been artificially inflated as a result of the price-fixing conspiracy among the Owners.
 
 
 57
 The district court recognized the existence of Genesco and Kerr-McGee, but we believe that it was incorrect in its effort to distinguish them in order to hold that JLM's antitrust claims are not subject to arbitration. The district court held that "[t]he crucial distinction between this case and [cases such as Genesco and Kerr-McGee] directing arbitration ... is the absence of any issues of contract interpretation in this dispute as framed in the complaint. JLM's claim in no way depends upon interpretation, construction, or application of any provision of the charter."
 
 
 58
 We first note that the district court's focus upon the absence of an issue of "interpretation, construction, or application of any provision" of the ASBATANKVOY implies that arbitration is only appropriate in cases which concern breach of contract claims. When we deal with a broad arbitration clause, however, "it is clear that we have not limited arbitration claims to those that constitute a breach of the terms of the contract at issue." Mehler v. Terminix Int'l Co., 205 F.3d 44, 50 (2d Cir.2000). Thus, this Circuit has rejected the notion that the presence of such claims is a prerequisite to sending a matter to arbitration.
 
 
 59
 Further, it is not true that the claims of conspiracy in Genesco and Kerr-McGee can be characterized as "issues of contract interpretation." Nor did the plaintiffs in those cases contend that these claims would be resolved through the "interpretation, construction, or application of any provision" of the contracts at issue in those cases. Rather, the plaintiffs in those cases alleged that they had been damaged by conspiratorial dealing of a party with whom they were in privity. These disputes concerning conspiratorial conduct were held to be arbitrable under the terms of broad arbitration clauses. Genesco and Kerr-McGee govern our result here; whatever the boundaries of the phrase "collateral matters," JLM's Sherman Act claims fall within them.
 
 
 60
 We also note the district court's reliance upon Kruman v. Christie's International PLC, 284 F.3d 384 (2d Cir.2002) is misplaced. Kruman, which has since been abrogated, see F. Hoffman-LaRoche Ltd. v. Empagran S.A., ___ U.S. ___, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004), is in any event irrelevant to the instant case because it did not deal with the extent to which antitrust claims arising in international commerce can be arbitrated. Rather, it dealt with a substantive issue of antitrust law—namely "the effect that anticompetitive conduct directed at foreign markets must have on domestic commerce to be actionable under antitrust laws." 284 F.3d at 389. But we are concerned here with the procedural question of arbitrability, not with matters of substantive antitrust law. Kruman, therefore, has no bearing on the instant case.[6]
 
 
 61
 2. Does the Arbitration Clause Bind the Owners?
 
 
 62
 Although the parties do not agree as to the actual number, it is undisputed that some of the charter contracts entered into by JLM during the proposed class period were signed by subsidiaries of the Owners, rather than by the Owners themselves. With respect to those contracts signed by subsidiaries, JLM argues, the Owners cannot invoke the ASBATANKVOY's arbitration clause "since the conspiratorial conduct giving rise to the claims in this case was conduct of the parent companies rather than the contracting subsidiaries."
 
 
 63
 We reject this argument. Our cases have recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of "the relationship among the parties, the contracts they signed ..., and the issues that had arisen" among them discloses that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271 F.3d 403, 406 (2d Cir.2001) (internal quotation marks and citation omitted). Thus in Choctaw, we found that where the merits of an issue between the parties was bound up with a contract binding one party and containing an arbitration clause, 271 F.3d at 407, the "tight relatedness of the parties, contracts and controversies" was sufficient to estop the bound party from avoiding arbitration, id. at 406. Similarly, in Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration International, Inc., 198 F.3d 88, 98 (2d Cir.1999), we held that the party attempting to resist arbitration was estopped from doing so because it had treated arguably non-signatory companies and their signatory assignees "as a single unit" in its complaint in a related lawsuit. Most recently, in Astra Oil Co. v. Rover Navigation, Ltd., 344 F.3d 276, 281 (2d Cir.2003), we found that petitioner Astra could hold respondent Rover to an arbitration clause to which Astra's affiliate AOT was also a signatory because of the "close corporate and operational relationship between Astra and AOT," because the claims Astra brought against Rover arose under the agreement binding AOT and Rover to arbitration, and because in various respects Rover had treated Astra as a party to the agreement. See also Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir.1995) (surveying cases in other circuits in which signatories have been bound to arbitrate "because of the close relationship between the entities involved ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations" (internal quotation marks and citation omitted)).
 
 
 64
 While we have cautioned that this estoppel inquiry is fact-specific, Smith/Enron, 198 F.3d at 97, and have had no occasion to specify the minimum quantum of "intertwined-ness" required to support a finding of estoppel, Astra Oil, 344 F.3d at 279, we have no difficulty concluding that it is present here. The questions the Owners seek to arbitrate are undeniably intertwined with the charters, since as we have already noted it is the fact of JLM's entry into the charters containing allegedly inflated price terms that gives rise to the claimed injury. See Choctaw, 271 F.3d at 407 (estopping the signatory where the merits of the dispute the non-signatory seeks to arbitrate are "bound up with" and "linked textually to" the terms of the contract that includes the arbitration clause); see also MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999) (holding that a signatory may be estopped "[w]hen each of a signatory's claims against a non-signatory makes reference to or presumes the existence of the written agreement") (internal quotation marks omitted). Nor can it be denied that JLM implicitly recognizes the "close relationship among the parties ... and controversies," or that it has treated the Owners "as if [they] were ... signator[ies] to the charter[s]." Astra Oil, 344 F.3d at 280. As the Owners note, the amended complaint "repeatedly alleges that, whatever corporate entities happened to sign the [charter contracts], [JLM] was purchasing shipping services directly from the parents and was harmed by the allegedly inflated prices charged by those parents...." See Smith/Enron, 198 F.3d at 97, 98 (estopping signatory where party seeking to avoid arbitration "treated ... [the] related companies as though they were interchangeable" and as "a single unit" in its complaint in related litigation). JLM's argument that the Owners cannot invoke the ASBATANKVOY's arbitration clause is therefore without merit.[7]
 
 
 65
 III. Has Congress Precluded the Arbitration of JLM's Sherman Act Claims?
 
 
 66
 1. Are Horizontal Price-Fixing Claims Non-Arbitrable?
 
 
 67
 The issue squarely before the Supreme Court in Mitsubishi was "whether an American court should enforce an agreement to resolve antitrust claims by arbitration when that agreement arises from an international transaction." 473 U.S. at 624, 105 S.Ct. 3346. The Court answered this question affirmatively:
 
 
 68
 [W]e conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that the contrary result would be forthcoming in a domestic context.
 
 
 69
 Id. at 629, 105 S.Ct. 3346. There is therefore no question that Mitsubishi held "that international arbitration of antitrust disputes is appropriate." Baxter Int'l, Inc. v. Abbott Labs., 315 F.3d 829, 832 (7th Cir. 2003).[8]
 
 
 70
 JLM therefore does not argue that Sherman Act claims per se cannot appropriately be resolved by arbitration panels. Rather, JLM contends that the type of antitrust claim it has asserted should not be arbitrated. JLM here presses the distinction between "horizontal" and "vertical" antitrust claims, which has been succinctly explained by the Sixth Circuit:
 
 
 71
 Courts have discerned two major types of antitrust conspiracies to restrain trade: horizontal and vertical. Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market, or among distributors to fix prices for a given market. Vertical conspiracies, on the other hand, involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.
 
 
 72
 Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir.1988). Mitsubishi, a vertical conspiracy case, involved a single manufacturer that allegedly conspired with its affiliate to illegally manipulate the distribution of its products. The instant case, by contrast, involves the existence of a horizontal conspiracy among several firms within the parcel tanker service industry to restrain competition, and thereby to dominate the market for parcel tanker services.
 
 
 73
 JLM cites nothing in the text of the Sherman Act itself, or in any legislative history relating to the Sherman Act, which suggests that Congress intended horizontal price-fixing claims to be non-arbitrable. JLM, however, draws our attention to the following passage from Mitsubishi, in which the Court rejected the argument that antitrust claims would likely be too complex for an arbitration panel: "[T]he vertical restraints which most frequently give birth to antitrust claims covered by an arbitration agreement will not often occasion the monstrous proceedings that have given antitrust litigation an image of intractability." 473 U.S. at 633, 105 S.Ct. 3346. JLM asserts that this "reflects a clear expectation that market-wide horizontal conspiracy cases such as this one—unlike vertical antitrust claims involving mere disputes between a manufacturer and its distributor—will not generally be `covered by' an arbitration clause." More specifically, JLM posits that "in a horizontal conspiracy case like this one—in which the injury stemming from the unlawful conduct ... result[s] in widespread injury to approximately 500 to 700 customers—to require individual arbitration by each of the 500 to 700 customers would so splinter the incentive to sue, and would so burden the claimants with duplicative burdens and expenses, that it inevitably would frustrate important interests of United States antitrust law in both compensation and deterrence."[9]
 
 
 74
 Even if we accept the premise that horizontal antitrust claims are likely to be more complex than vertical ones, however, this argument is unavailing. The statement from Mitsubishi upon which JLM relies is taken badly out of context. Immediately after it, the Court explicitly rejects the argument that the complexity of any sort of antitrust claim is a reason to reject arbitration. On the contrary, the Court suggests that arbitration may actually be superior to a judicial forum:
 
 
 75
 [A]daptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts either employed by the parties or appointed by the tribunal. Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a desire to keep the effort and expense required to resolve a dispute within manageable bounds that prompts them mutually to forgo access to judicial remedies. In sum, the factor of potential complexity alone does not persuade us that an arbitral tribunal could not properly handle an antitrust matter.
 
 
 76
 473 U.S. at 633-34, 105 S.Ct. 3346 (footnote omitted).
 
 
 77
 Thus, as the Owners point out, it is not surprising that "no court has ever read or applied" Mitsubishi in the manner that JLM calls for here. On the contrary, in a well-reasoned opinion, a district court of this Circuit has recently held that a putative class action alleging a horizontal antitrust conspiracy among issuers of credit cards was subject to arbitration. In In re Currency Conversion Fee Antitrust Litigation, 265 F.Supp.2d 385, 394 (S.D.N.Y. 2003), the plaintiffs alleged that several large banking associations which issue VISA and MasterCard "horizontally fixed the amount" of fees charged in connection with facilitating customer transactions in foreign currencies. The district court specifically rejected the contention "that horizontal price-fixing antitrust claims, such as those alleged by plaintiffs, are not arbitrable." Id. at 409; see also In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F.Supp.2d 1107, 1123-25 (D.Kan.2003) (holding claims made in putative class action lawsuits alleging conspiracy among major providers of telecommunications services to fix "pass-through charges" were referable to arbitration); Acquaire, 906 F.Supp. at 836 (referring to arbitration dispute alleging that major beverage makers sought "to achieve monopoly power in the soft drink and mixer market by fixing prices").
 
 
 78
 In sum, JLM's argument that the horizontal price-fixing conspiracy it alleges should not be resolved in an arbitrable forum does not amount to more than an argument that this case is too complex to be handled by arbitrators. Following Mitsubishi, however, we have squarely held that "[c]omplexity, of course, is not a reason to deny arbitrability." Genesco, 815 F.2d at 851. We therefore reject JLM's argument that an arbitration panel would be incapable of resolving its Sherman Act claims.
 
 
 79
 2. Does the Choice of Law Provision in the Arbitration Clause Preclude Arbitration?
 
 
 80
 JLM also urges the Court to consider the purported implications of the fact that the arbitration clause in the ASBATANKVOY standard form contract provides that the parties must elect either to arbitrate in New York City, under U.S. law, or in London, under British law. It asserts that about a third of the charters negotiated between JLM and the Owners make the British election. With respect to the putative class as a whole, JLM speculates that "London is chosen as the place of arbitration for the vast majority of the charters by the proposed Plaintiff Class."
 
 
 81
 We first note that this latter assertion is supported by nothing but an averment made "upon information and belief" in an affidavit by an officer of JLM who is "familiar[] with the industry." JLM nevertheless argues at some length that this Court should be troubled that British law is purportedly hostile to the claims of antitrust plaintiffs. It notes that Mitsubishi provides that arbitration will not be precluded "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." 473 U.S. at 637, 105 S.Ct. 3346. But, JLM argues, British antitrust law is inherently hostile to its claims and "thus could not provide an effective antitrust remedy in this case." JLM therefore concludes that "to require arbitration under those of Plaintiffs' agreements that provide for United Kingdom law would preclude Plaintiffs from `effectively vindicating their statutory causes of action' under United States antitrust law, thereby conflicting irreconcilably with Mitsubishi." We are certain, however, that we need not consider JLM's discussion of the nature of British antitrust law because its contention that a London arbitration panel will apply British law to JLM's substantive claims is, at this point, wholly speculative. And because it is speculative, our consideration of whether JLM will be able to effectively vindicate its rights under the Sherman Act is premature.
 
 
 82
 We rely here upon the Supreme Court's decision in Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). In that case, plaintiff, who owned a shipload of fruit which he contended had been damaged by defendant shipper, brought a claim against the shipper under Section 3(8) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1303(8). The contract between the parties called for arbitration of disputes before a Japanese arbitral panel. The plaintiff objected to arbitration on the ground that Japanese law afforded less protection to injured owners of shipped property than did COGSA. The Supreme Court squarely rejected this assertion, holding that speculation concerning what substantive law would be applied by a foreign arbitral panel is not properly considered by an American court prior to the arbitration itself:
 
 
 83
 Whatever the merits of [plaintiff's] comparative reading of COGSA and its Japanese counterpart, it claim is premature. At this interlocutory stage it is not established what law the arbitrators will apply to [plaintiff's] claims or that [plaintiff] will receive diminished protection as a result.... [Defendants] seek only to enforce the arbitration agreement. The District Court has retained jurisdiction over the case and "will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the ... laws has been addressed."
 
 
 84
 515 U.S. at 540, 115 S.Ct. 2322 (quoting Mitsubishi, 473 U.S. at 638, 105 S.Ct. 3346). It is worthwhile to note as well that, as in Mitsubishi, the Court expressed the imperative of avoiding the "disparage[ment of] the authority or competence of international forums for dispute resolution. [Plaintiff's] skepticism over the ability of foreign arbitrators to apply COGSA... must give way to contemporary principles of international comity and commercial practice." Id. at 537, 115 S.Ct. 2322.
 
 
 85
 JLM points us to no provision of the Sherman Act, or any legislative history pertaining thereto, which suggests that we should treat a claim arising under it in a manner different than the Supreme Court's treatment in Vimar Seguros of a claim under COGSA. We therefore decline JLM's invitation to speculate as to the substantive law that will be applied by a British arbitral panel and, as the Supreme Court directs in Mitsubishi, assume that JLM "effectively may vindicate its statutory cause of action in the arbitral forum." 473 U.S. at 637, 105 S.Ct. 3346.
 
 
 86
 IV. Arbitrability of JLM's Remaining Claims.
 
 
 87
 As already noted, in addition to its federal law claims under the Sherman Act, JLM has also asserted claims under Connecticut statutory and common law. Although the Owners moved for arbitration of all of JLM's claims, the district court only considered the arbitrability of the Sherman Act claims.
 
 
 88
 Both the courts of this Circuit and Connecticut state courts have routinely held that claims under Connecticut statutes relating to unfair competitive practices are arbitrable. See Discount Trophy & Co. v. Plastic Dress-Up Co., No. Civ. 3:03-CV-2167, 2004 WL 350477, at *3 n. 5 (D.Conn. Feb.19, 2004) (collecting cases). Further, JLM's only argument against arbitrating its state law claims is that "since [they] rest on the same facts as [JLM's] antitrust claims, they are no more subject to arbitration than are [JLM's] antitrust claims." We have concluded, however, that JLM's Sherman Act claims are indeed subject to arbitration and we see no reason why state law claims resting on the same facts, and subject to the same broad arbitration clause, should not be subject to arbitration as well.
 
 CONCLUSION
 
 89
 The order of the district court denying the Owners' motions to compel arbitration is reversed. This case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 JLM Industries, Inc., and its subsidiary JLM International, Inc., are Delaware corporations. JLM Industries (Europe) B.V., JLM Europe BV, and Tolson Holland are all incorporated in the Netherlands
 
 
 [2]
 Stolt-Nielsen SA is a Luxembourg holding company. Its subsidiary, Stolt-Nielsen Transportation Group Ltd. is a Liberian corporation. Odfjell ASA is a Norwegian corporation, and Odfjell USA Inc. is its American subsidiary. Jo Tankers B.V. is incorporated in the Netherlands and Jo Tankers, Inc. is its American subsidiary. Tokyo Marine Co., Ltd. is a Japanese corporation
 
 
 [3]
 We note that the instant action is one of at least ten lawsuits filed in federal district courts in Connecticut, Pennsylvania, and Texas against some or all of the Owners involving charges of anti-competitive conduct within the parcel tanker industrySee Odfjell ASA v. Celanese AG, No. 04 Civ. 1758, 2004 WL 1574728, at *1 n. 1 (S.D.N.Y. July 14, 2004). Further, "the Judicial Panel on Multidistrict Litigation has now transferred, or is in the process of transferring, these lawsuits ... to the District of Connecticut." Id.
 
 
 [4]
 The appeal of Tokyo Marine Co., Ltd. (Docket No. 03-7913(CON)) was filed separately from the appeal of Stolt-Nielsen SA, Stolt-Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers B.V., and Jo Tankers, Inc. (Docket No. 03-7683(L)). Pursuant to an October 16, 2003, order, this Court consolidated the two appeals. In a letter to the Court, dated October 24, 2003, counsel for Tokyo Marine Co., Ltd. stated that Tokyo Marine Co. adopts the positions taken in the briefs filed by the other defendants in their appeal
 
 
 [5]
 Even if we were to find that JLM's argument concerned the arbitration term alone, making the question one for the court, there is no indication that the arbitration clauseitself is an unconscionable or oppressive term of adhesion. "For an arbitration provision to be stricken as a contract of adhesion there must be a showing of unfairness, undue oppression, or unconscionability." David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 249 (2d Cir.1991) (internal quotation omitted). See also Klos, 133 F.3d at 168-69 ("The concept of adhesion ... may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability."). JLM is a large and sophisticated commercial enterprise that was familiar with and well understood the ASBATANKVOY's terms. Even where there is some disparity in bargaining power, there is no inherent unfairness or unconscionability in an arbitration clause if both parties are bound by it and know of its existence. See, e.g., Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir.1999) (holding arbitration clause in form contract on which employment was conditioned not unconscionable contract of adhesion because it bound both parties); Doctor's Assocs., Inc. v. Jabush, 89 F.3d 109, 113 (2d Cir.1996) (holding franchisees who accepted form arbitration agreement as condition of purchasing franchise not unfairly surprised or oppressed).
 
 
 [6]
 We also note JLM's suggestion that "this Court's articulation of definitive phraseology" occurs in our opinion inCollins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16 (2d Cir.1995). Specifically, JLM argues that the following statement in Collins & Aikman supports its assertion that the district court properly restricted the scope of the arbitration clause: "[C]laims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement." Id. at 23. This, says JLM, is "the definitive legal standard" in this Circuit regarding the scope of arbitration clauses. But Collins & Aikman also quotes with approval the following passage from Genesco: "If the allegations underlying the claims `touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." Id. at 21 (quoting 815 F.2d at 846; emphasis and ellipsis omitted). The case also presents a clearly distinguishable factual situation in that the Court was faced with claims arising from two distinct agreements between the parties; one ("the 1977 agreement") which contained an arbitration clause and one ("the 1988 agreement") which did not. The Court held that only claims arising out of or related to the 1977 agreement would be "grist for the arbitration." Id. at 21-22. But even with respect to claims that explicitly sought relief under the 1988 agreement, the Court held that it would "look to the conduct alleged and determine whether or not that conduct is within reach of the 1977 arbitration clause." Id. at 20.
 
 
 [7]
 JLM also argues that the ASBATANKVOY's arbitration clause cannot be invoked to compel arbitration of any claim that a given Owner is jointly and severally liable for the Sherman Act violations of another Owner. This argument necessarily fails for related reasons. The principles of estoppel we have just discussed are not limited to relations among corporate parents and their signatory subsidiariesSee, e.g., Choctaw, 271 F.3d at 403 (estopping building owner from avoiding arbitration of claim against signatory builder's surety); MS Dealer, 177 F.3d at 948 (estopping car buyer from avoiding arbitration with service company that allegedly conspired with signatory car dealership). Each claimed injury under the Sherman Act arises from the fact that JLM entered into a charter with a given Owner or its subsidiary; each such charter included the ASBATANKVOY's broad arbitration clause. Because, as JLM asserts in its amended complaint, all of the Owners conspired, each with the others, to inflate the freight terms of any one such contract, any claim against an Owner jointly liable for the injury caused by that contract is inextricably intertwined with the arbitrable claim against the Owner liable under that contract. We do not, in so holding, mean to suggest that a claim against a co-conspirator of a party alleged to have engaged in antitrust violations will always be intertwined to a degree sufficient to work an estoppel. The inquiry remains a fact-specific one. See, e.g., In re Managed Care Litig., 132 F.Supp.2d 989, 995 (S.D.Fla.2000) (finding that nonsignatory defendants, alleged to be aiders and abettors and co-conspirators of signatories, did not have the requisite "close relationship" on the facts there present), modified on other grounds, 143 F.Supp.2d 1371 (S.D.Fla.2001). Cf. Acquaire v. Canada Dry Bottling, 906 F.Supp. 819, 838 (E.D.N.Y.1995) (finding that claims against "myriad entities and individuals who ... participated in and benefitted from the alleged price-fixing" were "peripheral to" the arbitrable claims). On the facts of this case, however, we easily conclude that non-signatory Owners "ha[ve] a close relationship with the parties bound to arbitrate," that a claim of joint and several liability "concerns that relationship," and that "the dispute is closely linked to a dispute that is subject to arbitration in the underlying contract." Choctaw, 271 F.3d at 405.
 
 
 [8]
 Indeed, followingMitsubishi, several Circuit Courts of Appeals have held that antitrust disputes involving purely domestic markets are arbitrable as well. See Seacoast Motors of Salisbury, Inc. v. DaimlerChrysler Motors Corp., 271 F.3d 6, 10 (1st Cir.2001) (collecting cases). A number of district courts in our Circuit have reached the same conclusion. See Acquaire, 906 F.Supp. at 837 (collecting cases).
 
 
 [9]
 JLM's comments regarding the wisdom of arbitrating the claims of "500 to 700 customers" are purely speculative. Although this case is brought as a class action, no class has been certified and, as yet, JLM represents no party but itself. We also note that we do not understand JLM to be making any argument to the effect that its assertion of class claims should serve as a bar or deterrent to sending the instant case to an arbitral panel. We would likely view such an argument skeptically because "[f]ederal courts have ... consistently enforced arbitration provisions in the context of class action lawsuits when federal statutory claims have been at issue."Lewis Tree Serv., Inc. v. Lucent Techs. Inc., 239 F.Supp.2d 332, 338 (S.D.N.Y.2002).