**MIRANT AMERICAS ENERGY MARKETING LP, Plaintiff,**

**v.**

**1ST ROCHDALE COOPERATIVE GROUP, LTD., Defendant.**

**No. 04 CIV. 7623(JSR).**

United States District Court,
S.D. New York.

April 5, 2005.

James Joseph Barriere, Couch White, LLP, Albany, NY, Eric N. Macey, Donald

A. Tarkington and Louis C. Szura of No-vack & Macey, LLP, Chicago, IL, for Plaintiff.

Stuart Arlin Blander, Eli Feit, Heller, Horowitz & Feit, P.C., New York, NY, for Defendant.

## MEMORANDUM ORDER

RAKOFF, District Judge.

On December 9, 2004, defendant 1st Rochdale Cooperative Group, Ltd. ("Rochdale") moved to stay or dismiss this breach of contract action between two energy companies on the ground that the controversy was required to be submitted to arbitration. Following briefing and oral argument, the Court, on February 4, 2005, denied the motion. *See* Order, 2/4/05.[1] The reasons for that determination are briefly set forth below. In addition, because defendant, on March 31, 2005, filed for bankruptcy, thus staying further proceedings, this Memorandum Order will serve to place the case on the Court's Suspense Calendar.

Regarding defendant's prior motion, the relevant facts are undisputed. In May 2001, Rochdale and plaintiff Mirant Americas Energy Marketing LP ("Mirant") entered into a Master Agreement to govern electric power transactions between the two parties. *See* 2001 Master Agreement, attached to Affidavit of Stuart A. Blander, 12/9/04, as Exhibit C. This agreement did not contain an arbitration clause.

The companies then began negotiating a more specific arrangement under which Mirant would sell energy wholesale to Rochdale so that Rochdale could continue providing retail service to its New York customers. In addition, Rochdale would provide Mirant with retail customer care and "energy scheduling services." *See* Letter of October 22, 2001, attached to

Plaintiff's Memorandum in Response to Defendant's Motion to Dismiss or Stay the Action ("Pl. Mem.") as part of Exhibit B.[2]

Rochdale, however, faced mounting liquidity problems. In October 2001, Rochdale received a collateral call from the New York Independent System Operator, Inc. ("NYISO"), which coordinates the buying and selling of energy. Before responding, Rochdale sought accommodations of its obligations to Mirant (and to another company, TSE Services, which provides billing and collections services). *See* Security and Lockbox Agreement, attached to Pl. Mem. as Exhibit B, ¶¶ A–D. In exchange for such accommodations by Mirant, Rochdale, on March 27, 2002, granted Mirant a first priority security interest in various assets and agreed to create an escrow account controlled by Mirant. *Id.* ¶ E. This agreement (the "Security and Lockbox Agreement") also contained no arbitration clause, and the parties agreed to submit to the jurisdiction of district courts in the Southern District of New York. *Id.* ¶ 21.7.

With the Security and Lockbox Agreement between Rochdale and Mirant now in place, the parties turned to assuaging NYISO's concerns about permitting Rochdale to participate in its energy markets. On April 24, 2002, Mirant, Rochdale, and NYISO entered into a three-way contract (the "Credit Agreement") governing the terms under which NYISO would allow Rochdale to purchase energy on credit. *See* Credit Agreement, attached to Pl. Mem. as Exhibit C. NYISO agreed to forbear from enforcing its usual financial requirements, which Rochdale could not otherwise meet, so long as Rochdale made all its purchases in the name of Mirant, which would be the

1. On March 1, defendant filed notice that it would take an interlocutory appeal of the February 4 order in accordance with 9 U.S.C. § 16(1)(A).

2. Plaintiff has attached several documents as "Exhibit B."

financially responsible party. *Id.* at 1. The Credit Agreement stated that Mirant and Rochdale already had an agreement between themselves and that nothing in the Credit Agreement itself obligated Mirant to make such purchases for Rochdale. *Id.* Mirant agreed that, if Rochdale were to breach its agreement with Mirant, forcing Mirant to cease or suspend its energy deliveries to Rochdale, Mirant would provide NYISO with a seven-day termination notice so that NYISO could transfer Rochdale's customers to other providers. *Id.* ¶ 7.

In a paragraph entitled "Disputes," the Credit Agreement stated that the parties agreed to make commercially reasonable efforts to resolve through joint discussions "any dispute, controversy, or claim arising out of or relating to this Agreement." *Id.* ¶ 10. If such discussions failed, the dispute could "be submitted to the Dispute Resolution Administrator of the NYISO … for resolution." *Id.* Although neither side has offered any evidence as to the procedures that this Dispute Resolution Administrator follows, both sides suggest that it is tantamount to binding arbitration, and the Court has so assumed for purposes of this motion.

On May 9, 2003, Mirant and Rochdale amended their Master Agreement to add more specific terms. *See* First Amendment, attached to Pl. Mem. as Exhibit B. The amendment recited the parties' earlier contracts—not including the Credit Agreement with NYISO—and affirmed their intention to otherwise continue dealings in accordance with their earlier contracts. *Id.* at 1, 9.[3] There is no mention of arbitration.

On September 16, 2004, Mirant filed this claim, alleging that Rochdale had failed to

make various payments and that Mirant, under the terms of the amended Master Agreement, could terminate all open transactions and seek immediate payment. Mirant does not allege violation of the Credit Agreement. Rochdale then moved to stay or dismiss this case, arguing that the arbitration clause of the Credit Agreement allows it to take to arbitration any disputes arising out of the same general subject matter.

 While federal policy "strongly favors arbitration," and arbitration clauses should therefore be construed "as broadly as possible," *Collins & Aikman Prods. Co. Bldg. Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995), ultimately, since arbitration is a contractual matter governed by the parties' stated intent, a party cannot be required to submit a claim to arbitration without its contractual consent, express or implied, *JLM Industries, Inc. v. Stolt–Nielsen SA,* 387 F.3d 163, 171 (2d Cir. 2004). The question, therefore, is whether the arbitration clause in the Credit Agreement can be construed as covering a dispute that does not arise out of an alleged breach of that agreement and does not require construction of that agreement.

It is clear that, under some circumstances, an arbitration clause in a contract can bind parties to arbitration even when the claim is not breach of that contract. However, the Second Circuit has struggled to articulate a useful test of when those circumstances are found. *See id.* at 172–73 (acknowledging that tests do not yield "principled way" of determining which claims should be arbitrated); *Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 50 (2d Cir.2000) (collecting various tests Circuit has stated, seemingly interchange-

---

**3.** The exhibit submitted to the Court has no pagination. For present purposes, the Court

assigns the exhibit consecutive page numbers.

ably). In some cases, the Circuit has required the claim to "implicate issues of contract construction or the parties' rights and obligations under" the contract containing the arbitration clause, *Louis Dreyfus Negoce v. Blystad Shipping & Trading, Inc.,* 252 F.3d 218, 225 (2d Cir.2001); *Collins & Aikman,* 58 F.3d at 23, while in others it has required only that the claim "touch matters" covered by the contract, a test which potentially sweeps a broader set of claims into arbitration, *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 846 (2d Cir.1987).

On closer scrutiny, however, it is apparent that the cases employing the "touch matters" test do not involve a choice between two contracts (as here), or, indeed, contractual claims at all. Instead, in these cases plaintiffs have sued in tort, alleging misdeeds by defendants related to the making and performance of the contracts. *See JLM Industries,* 387 F.3d at 176 (antitrust claims alleging that defendants conspired to fix artificially high prices through a series of contracts were "arising out of" the contract); *Genesco,* 815 F.2d at 845–47 (RICO claims alleging that suppliers engaged in conspiracy to overcharge and supply defective goods were "matters relating to the agreements between the parties"); *see also Kerr–McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 468–69 (2d Cir.1991). Indeed, the "touch matters" language originated in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 624 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), which itself involved an alleged conspiracy to violate the Sherman Act.

■ On the other hand, where, as here, the question is whether the arbitration clause in one contract should govern a claim alleging breach of a different contract, the Second Circuit consistently has asked whether the claim requires construc-

tion of the contract that contains the arbitration clause or otherwise implicates the parties' rights and obligations under that contract. *See Louis Dreyfus,* 252 F.3d at 228–29; *Collins & Aikman,* 58 F.3d at 23; *see also Lewis v. N.J. Sports Prods., Inc.,* 2003 WL 1090279, at *3–*4 (S.D.N.Y.2003) (collecting cases).

■ Adjudicating plaintiff's claim that the Master Agreement and various subsidiary agreements have been breached clearly does not require construction of the Credit Agreement, which is the only document with an arbitration agreement. Nor does plaintiff's claim in any way implicate rights and obligations created by the Credit Agreement, which explicitly disclaims any intent to alter the terms of the Mirant–Rochdale relationship. Except for the issue raised by the instant motion, the Credit Agreement plays no role in this lawsuit whatsoever.

It is true that some courts, when confronted with the alleged breach of a contract containing no arbitration clause but made contemporaneously with another contract that does contain such a clause, have sometimes read the arbitration clause into the contract allegedly breached, on the ground that the two contracts effectively reflect a broader agreement governing a single transaction. *See, e.g., Mehler,* 205 F.3d at 47–49; *Pers. Sec. & Safety Sys., Inc. v. Motorola, Inc.,* 297 F.3d 388, 394–96 (5th Cir.2002). However, in the instant case the Credit Agreement was not made contemporaneously with the Master Agreement and cannot be considered part of the same transaction. Indeed, the Credit Agreement has an additional party (N.Y.ISO) that was not a party to the Master Agreement. *Cf. Lewis,* 2003 WL 1090279, at *3.

Although defendant argues that the Credit Agreement was essential to the Master Agreement, in that defendant

could not have met its obligations had NYISO not agreed to allow it to trade on the energy markets, this proves far too much. Under this theory, any agreement with a third-party supplier could be considered essential to the fulfillment of a buyer-seller contract. While the Credit Agreement was the means by which defendant fulfilled the requirements of the Master Agreement, it was not the only way in which defendant could have done so, and so it cannot be considered essential to the Master Agreement. There is no evidence that, at the time the Master Agreement was signed, the parties even contemplated the Credit Agreement.

In short, the two contracts cannot be considered parts of a single transaction.

The Court concludes, therefore, that the Credit Agreement was intended to govern the parties' relationship with NYISO, not the entirety of the parties' relationship with each other. The Credit Agreement's arbitration clause was not intended to send to NYISO's dispute resolution process any disputes between the parties not involving their relationship with NYISO. Adjudicating the instant lawsuit will not require construction of the Credit Agreement or the parties' rights and obligations under it.

For the foregoing reasons, the Court, by order dated February 4, 2005, denied defendants' motion to stay or dismiss in favor of arbitration. Now, in addition, because defendant has filed for bankruptcy, the Clerk of the Court is directed to place this case on the Court's Suspense Calendar. Counsel for the parties are directed, however, to notify the Court in writing every six months, beginning October 5, 2005, as to the status of the bankruptcy so far as it implicates this case.

SO ORDERED.